# Exhibit A

FILED
DALLAS COUNTY
1/5/2017 7:26:00 PM
FELICIA PITRE
DISTRICT CLERK
David Hernandez

DC-17-02581

**CAUSE NO. _____**

| | | |
|---|---|---|
| ROBERT A. BERRY, INDIVIDUALLY AND AS TRUSTEE FOR THE ROBERT A. BERRY 2010 TRUST, | § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY, TEXAS |
| *Plaintiffs* VS. | § § § § | |
| GRACE RESOURCES, INC. F/K/A GRACE RESOURCES, LLC, JAMES NORVELL, BILLY MARCUM, JR. ELECTRA DEVELOPMENT PARTNERS L.P., ELECTRA WEST PROGRAM, L.P., GUNSIGHT PARTNERS L.P., GILLIAM PARTNERS L.P., RIVERBEND PRODUCERS L.P. ROCK ENERGY RESOURCES, LLC F/K /A ROCK ENERGY RESOURCES, INC. AND GAMBILL ENERGY, LLC *Defendants.* | § § § § § § § § § § § § § § § § | _____JUDICIAL DISTRICT |

**PLAINTIFFS VERIFIED ORIGINAL PETITION, APPLICATIONS FOR APPOINTMENT OF RECEIVER, APPOINTMENT OF AUDITOR, TEMPORARY RESTRAINING ORDER, TEMPORARY AND PERMANENT INJUNCTIONS**

TO THE HONORABLE JUDGE OF SAID COURT:

Robert A. Berry, individually and as trustee for the Robert A. Berry 2010 Trust, (hereafter, "Berry" or "Plaintiff") in the above-entitled and numbered cause, files this Original Verified Petition complaining of Defendants James Norvell, Billy Marcum, Jr. and Grace Resources, Inc. f/k/a Grace Resources, LLC ("Grace"), itself and as general partner of Defendants, Electra Development Partners L.P., Electra West Program, L.P., Gunsight Partners, L.P., Gilliam Partners, L.P. and Riverbend Producers, L.P., and Defendants, Rock Energy Resources, LLC, f/k/a Rock Energy Resources, Inc. (hereinafter collectively "Defendants"). Berry asserts causes of action under the Texas Securities Act, TEX. REV. CIV. STAT. ANN. art. 581-1 *et seq.* ("Securities Act"), fraud, fraud in the inducement, fraud in a real estate transaction, negligent and intentional misrepresentations,

conversion, negligence, gross negligence, breach of fiduciary duty, breach of contract, an accounting and unconscionable and unsavory acts under the Deceptive Trade Practices Act. Berry also seeks the imposition of a constructive trust and equitable lien with respect to assets of any kind obtained through the fraudulent scheme, including, but not limited to, assets fraudulently transferred to third parties. Berry further makes application for the appointment of a receiver, appointment of auditor, a temporary restraining order, a n d a temporary injunction. Lastly, Berry makes application for a permanent injunction and restitution, and in support thereof, would show the court the following.

## I. TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

Berry seeks immediate injunctive relief in the form of a Temporary Restraining Order against Defendants, including their officers, directors, principals, partners, joint ventures, stockholders, employees, agents and/or representatives of Defendants' entities, to prevent them from engaging in the unlawful acts described below, and from disposing of or concealing in any manner any property, assets, books or records, and to protect any funds obtained from Plaintiff who has oil and gas investments described below from Defendants or their agents, employees, or representatives.

## II. DISCOVERY LEVEL

Discovery is intended to be conducted under Level 2, as set out in Texas Rule of Civil Procedure 190.

## III. PARTIES

- Berry is an investor and purchaser of Defendants' oil and gas investments involving the "Electra," "Gilliam," "Riverbend" or "Monohan", and "Gunsight (Phases 1 and 2)" projects.

2

- Defendant Grace is a corporation with its principal place of business located at 2007 N. Collins Blvd, Suite 501, Richardson, Texas 75080 and can be served with process through its president and registered agent James Norvell at 4513 Valley Glen Dr., Carrollton, Texas 75010.

- Defendant James Novell is an individual who resides in Carrollton, Texas and can be served at 4513 Valley Glen Dr., Carrollton, Texas 75010.

- Defendant Billy Marcum Jr. is an individual who resides in Decatur, Texas and can be served at 132 Highland Dr., Decatur, Texas 76234.

- Defendants, Electra Development Partners L.P., Gunsight Partners, L.P., Gilliam Partners, L.P. and Riverbend Producers, L.P. are Texas Limited Partnerships and can be served with process through their registered agent, Craig Beling, at 4709 Melrose Park Court, Colleyville, Texas 76034.

- Defendant, Gambill Energy LLC and Rock Energy Resources, LLC, f/k/a Rock Energy Resources, Inc. is a Texas Limited Liability Company, and can be served with process through its registered agent James Norvell at 801 E. Campbell Rd., Suite 245C, Richardson Texas 75081.

## IV. JURISDICTION AND VENUE

Venue is proper in Dallas County, Texas because all or a substantial part of the events or omissions giving rise to the claims occurred in Dallas County, Texas. *See* Texas Civil Practice & Remedies Code Section 15.002(a)(1).

Additionally, venue is proper in Dallas County, Texas because it is the county of Defendant Grace's principal office in this state. *See* Texas Civil Practice & Remedies Code Sections 15.002(a)(2-3).

## V. NATURE OF THE CASE

### A. Berry's Investment History with Defendants

Defendant James Norvell ("Norvell") serves as the Chief Executive Officer of Defendant Grace Resources, Inc, which operates out of an office in Dallas County, Texas. Defendant Billy

Marcum, Jr. serves or served as the Chief Operating Officer of Grace. Upon information and belief, Defendants are engaging in fraudulent activities. All of these acts pose an immediate threat to the public. Plaintiff seeks to cause an immediate halt to Defendants' illegal and fraudulent operations and to freeze the account(s) where investors' funds are held.

Robert A. Berry, as trustee for the Robert A. Berry 2010 Trust, has invested almost two-and-a-half million dollars in projects run by Grace as limited partnerships to which it serves as the managing general partner, specifically the Gunsight Program (Phases 1 and 2), the Riverbend Program (later abandoned and converted into the Monahan Program), the Gilliam Program, and the Electra Program. Berry first invested $109,000 in the Gunsight Program – Phase 1 in January 2014. Berry received his first returns, totaling roughly $4,000, in March 2014, and Gunsight project updates in February of the same year touted increased production on the horizon.

In April 2014, Norvell and Grace began to solicit investments for the Riverbend Program, remarking that the "raise and results of our past two programs did not merit sending a formal book" for this investment. Essentially, Norvell and Grace pled for investors to "trust me." Berry invested $309,350.00 in the Riverbend program.

In June 2014, Norvell and Grace came back to investors with information on the next investment opportunity, namely the Gilliam Program, promising, "Grace will continue proving our passionate beliefs by increasing our performance for our partners." Berry invested $765,000.

In August 2014, Defendants sent an update to investors: Gunsight production was down, but recent revenue totaled approximated $31,000; Riverbend production was expected to increase with revenue checks coming to investors shortly; and Gilliam production was flowing and expected

to double or triple.[1] A month later, Defendants reached out to Gunsight Program partners for their contribution to Phase 2, a requirement of their partnership. Berry invested $164,000.

In October 2014, Marshall DenHartog, Berry's corporate attorney, requested documents that outlined the expected production and geological survey for the Gilliam Program as they had received for past projects. Norvell and Grace gave no response, and DenHartog never received the documents. Instead, Norvell emailed Berry weeks later with hype on a new project—the Electra Program—that would supposedly pay itself out in four to six months. Berry invested $1,090,000 in the Electra Program in November 2014.

Norvell and Grace's November 2014 update on its drilling efforts boasted increased oil production on all projects: Gunsight was 15 days behind goal, but oil loads had increased to seven loads from twenty-two wells; Gilliam leases were producing 21.5 barrels of oil per day ("BOPD"); Riverbend was continuing to produce 8.5 BOPD; and Electra had wells producing 35 and 30 BOPD with new drills planned imminently.[2] But no distributions came to investors; by January 2015, Defendants were blaming low oil prices for the lack of return to investors. And when confronted with the question of whether Defendants had a plan for the projects if oil prices stayed low, Defendants remained silent.

Despite their claims of low income due to low oil prices, in March 2015, Defendants decided to expand their Electra Program and sought more investment, telling investors that first flow tests on the Electra project were on point. Berry did not buy into this project. Three weeks later, Norvell approached Berry personally with an "opportunity" to take part in the royalties on this expansion project, called the Electra West Program. Berry declined and instead asked for the

---

[1] Such updates included more information than the highlights listed here.
[2] Such updates included more information than the highlights listed here.

2014 K-1s for his investments and asked if all was alright with the current projects. Norvell promised K-1 forms within the week and remained silent on project profitability.

Unsurprisingly, the K-1s were not distributed within the week. Instead of tax information desperately needed for investors to complete their taxes, Defendants sent an email to investors detailing reasons for the delay, namely that Defendants had hired a new accounting firm and switched to new accounting software that would "greatly improve [Grace's] internal accounting system and help [them] maintain quality records and account for [their] partners." Plaintiff followed up repeatedly on the tax information, but Defendants remained silent on the K-1s until July 17, 2015, roughly a week after Defendants' head accountant and CFO, Deanne Malter ("Malter"), resigned. Even then, Defendants' only produced K-1s for the Electra, Riverbend, and Gilliam programs.

July 17, 2015 is the same day that Defendant Grace Resources filed a lawsuit against Malter for, *inter alia*, breach of contract, breach of fiduciary duty, and conversion. *Grace Resources, Inc. v Malter*, Case No. DC-15-08070, Harris County, Texas (the "Malter Lawsuit"). In her counterclaim, Malter added Norvell as a counterclaim defendant and described Norvell's felonious history, his incarceration between 2010 and 2012, his relapse into drug use in 2015, his graphic and disturbing sexual harassment of Malter and her secretary, and, most pertinently to this case, his diversion of investor funds to his own personal accounts. Around the same time, previous Grace Resources employee Michael Merlo reported Norvell and Grace on www.ripoffreport.com, stating that investor funds have been used for personal purchases, such as a half-million-dollar home purchased with cash. Grace Resources added Merlo as a defendant in the Malter Lawsuit on September 28, 2016; one week later the report was suspiciously recanted.

Berry was unaware of such lawsuit until Defendants' recent use of the Malter Lawsuit as an excuse for not providing Berry, an investor and partner in Defendants' programs, with access to

6

any project documents, records, or financials; Defendants claim that all documents and records were rendered inaccessible when Malter left and changed encryption passwords. Berry was also unaware of the Ripoff Report until multiple requests to produce company records recently went unsatisfied and prompted deeper investigation of Defendants.

Instead, at the time the Malter Lawsuit was getting started, Berry was inquiring as to the final outstanding, and vastly delinquent, K-1 for the Gunsight Program. Almost a month after Defendants' provision of the first three K-1s, Berry still had not received the Gunsight K-1. On August 10, 2015, Norvell promised to send them within the week.

Two weeks later, Berry again inquired after the Gunsight K-1, again asking if Norvell had a plan for the wells if oil prices stayed low. In response, Norvell boasted an acquisition and development fund that Berry could buy into to receive 70-80% tax deductions and stated that the K-1 delay is now due to catching up on revenue calculations. Norvell gave no insight into a plan for the wells during low oil prices. However, Norvell *did* describe an upcoming sale of 400 barrels from the Electra project, an upcoming sale of the Riverbend wells with reinvestment into "the Monahan Program," and the initial production of two new wells in the Gilliam Program that were producing at 21 and 25 BOPD. These statements by Norvell were simply not true. Note, at no time did Norvell mention the resignation of Defendants' CFO, Malter, or any inability to access project financial documents. If anything, Norvell indicated that all were still under review by an accounting firm.

Norvell, at long last, sent the Gunsight K-1 on September 10, 2015, over five months after they should have been sent and two months after the first K-1s. A month later, Defendants sent a third quarter 2015 update on all projects: Gunsight operation costs were to payout within 30 days of production, and wells were currently producing at 22 BOPD; two new Gilliam wells had initial

production of 20 BOPD and a third has 3 BOPD, yielding 24 BOPD on the Gilliam program in September; and Electra production was expected to increase from 4 BOPD to 18 BOPD soon.[3]

A fourth quarter 2015 update described the installation of automated monitoring equipment to protect against theft of equipment and oil but made no mention of any theft or loss on Defendants' projects. It also gave updates on the three remaining projects: Gilliam saw seven new wells drilled and was expected to see 15-20 BOPD on two other wells to be drilled; Gunsight wells were being reworked/dug; and one Electra lease was producing 30 BOPD.[4]

In January 2016, Defendants continued their solicitation of Berry by offering investment in a new project with consistent production of 12 BOPD. Berry declined. Low and behold, in March 2016, Norvell approached Berry to request a loan of $1.5 Million Dollars, or, alternatively, a loan of one million dollars and an investment of $500,000. When Berry's offer terms gave him greater insight into company records and control, Norvell declined, despite this money being "do or die" for existing investments. With suspicion mounting, on April 6, 2016, Berry made a formal request to review company documents as he is entitled to do under all partnership agreements for all investments. Berry received no response.

On April 12, 2016 Berry made a second request for access to company records. This time, Norvell informed him (1) that Defendants were currently pursuing an operator, Bill Marcum, Jr., who had presumably absconded with oil, to the fullest extent of the law[5], (2) that two women, Debbie and Pat, were auditing and rebuilding Defendants' books, and (3) that litigation had all company records and financials "locked down in computers, to which [Norvell] presently [has] no access."

---

[3] Such updates included more information than the highlights listed here.
[4] Such updates included more information than the highlights listed here.
[5] The Court may note that counsel for Berry has been unable to locate any lawsuit filed against Defendant, Billy Marcum, Jr.

8

So Berry waited while "Debbie and Pat" rebuilt the books. Thereafter, Berry, by his attorney, made a third request for access to project documents. On November 30, 2016, Norvell responded to say that these records were encrypted and in disarray by the actions of former CFO Deanne Malter.

Defendants have not sent any updates on the projects in a year, and for nearly $2.5 Million Dollars in investment, Berry has seen $61,934.00 in returns. Berry has not received any distributions since in over a year.

## B. Where has all the money gone?

Per each project's subscription agreement, Defendants purportedly induced investments totaling almost $8,000,000 for projects in 2014 alone. Defendants solicited twenty units of investment at $54,500 per unit for the Gunsight Program (Phase 1), totaling $1,090,000. Defendants solicited twelve units of investment at $77,337.50 per unit for the Riverbend Program, totaling $928,050. Defendants solicited twenty units of investment at $153,000 per unit for the Gilliam Program, totaling $3,060,000. Defendants solicited twenty units of investment at $82,000 per unit for the Gunsight Program (Phase 2), totaling $1,640,000. And Defendants solicited twenty units of investment at $109,000 per unit for the Electra Program, totaling $2,180,000. However, none of these projects have ever been profitable for anyone other than Defendants.

In fact, reports from the Texas Railroad Commission show the following on each program:

**Electra and Electra West**

- No reporting on the Sue Stringer B lease no. 33219, which has been operated since June 2016 by Defendant, Gambill Energy, LLC;

- No reporting on the Sue Stringer lease no. 04997, which has been operated since June 2016 by Defendant, Gambill Energy, LLC

- No reporting on the Smith, J. D. lease no. 04996, which has been operated since

June 2016 by Defendant, Gambill Energy, LLC

- No reporting on the Red River Oil CO. lease no. 09341 lease no. 04996, which has been operated since June 2016 by Defendant, Gambill Energy, LLC

- No reporting on the Smith, Jodie D. lease no. 05453, which has been operated since June 2016 by Defendant, Gambill Energy, LLC

- No reporting on the Crow, W.E. lease no. 05154, which has been operated since June 2016 by Defendant, Gambill Energy, LLC

**Gunsight Program**

- On the Birk C. Estate lease no. 16932, 329 barrels of oil produced, and only 293 of these barrels sold since July 2014, the date Defendant Rock Energy Resources LLC took over as the operator.

- On the Hill lease no. 15858, 433 barrels of oil produced since July 2014, the date Defendant Rock Energy Resources LLC took over as the operator.

- On the Preston Lease no. 16890, 498 barrels of oil, and 851 barrels of oil disposed, since July 2014, the date Defendant Rock Energy Resources LLC took over as the operator.

- On the KEBMC lease no. 19331, 231 barrels of oil produced, and 280 barrels of oil disposed, since July 2014, the date Defendant Rock Energy Resources LLC took over as the operator.

- On the Warren F.P. lease no. 05084, 96 barrels of oil have been produced, and 293 barrels of oil have been disposed, since October 2014, the date Defendant Rock Energy Resources LLC took over as the operator.

**Monohan**

- On the Monohan, E. S. lease no. 00333, 632 barrels of oil have produced, and 738 barrels of oil have been disposed since December 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the Monohan lease no. 28530, 532 barrels of oil have been produced, and 565 barrels od oil have been disposed since December 2014, the date Defendant Gilliam Partners LP took over as the operator.

**Gilliam**

- On the Covington B. lease no. 03332, 395 barrels of oil have been produced, and 595 barrels have been disposed, since October 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the Moore lease no. 03297, 16 barrels of oil have been produced, and 46 barrels have been disposed, since October 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the Carter, Nettie lease no. 12804, 1221 barrels of oil have been produced, and 1068 barrels have been disposed, since October 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the IFDP lease no. 28575, 436 barrels of oil have been produced, and 545 barrels have been disposed, since December 2014, the date Defendant Gilliam Partners LP took over as the operator.

The numbers above are completely inconsistent with the statements by Defendants. Even more egregious, is that Norvell, on March 7, 2016, acting as "President" of Gunsight Partners, LP, conveyed all of the working interest and net revenue interest owned by the partnership to a third

- On the Monohan, E. S. lease no. 00333, 632 barrels of oil have produced, and 738 barrels of oil have been disposed since December 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the Monohan lease no. 28530, 532 barrels of oil have been produced, and 565 barrels od oil have been disposed since December 2014, the date Defendant Gilliam Partners LP took over as the operator.

**Gilliam**

- On the Covington B. lease no. 03332, 395 barrels of oil have been produced, and 595 barrels have been disposed, since October 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the Moore lease no. 03297, 16 barrels of oil have been produced, and 46 barrels have been disposed, since October 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the Carter, Nettie lease no. 12804, 1221 barrels of oil have been produced, and 1068 barrels have been disposed, since October 2014, the date Defendant Gilliam Partners LP took over as the operator.

- On the IFDP lease no. 28575, 436 barrels of oil have been produced, and 545 barrels have been disposed, since December 2014, the date Defendant Gilliam Partners LP took over as the operator.

The numbers above are completely inconsistent with the statements by Defendants. Even more egregious, is that Norvell, on March 7, 2016, acting as "President" of Gunsight Partners, LP, conveyed all of the working interest and net revenue interest owned by the partnership to a third

party, Western Movements, LLC, without informing the partners or sharing in the distribution from the proceeds.

Initial offering materials introduced investors to the "experts" who analyzed and estimated the production values of the wells for each project. Experience of these experts ranged from 10 to 48 years in the industry and included professional engineers, geophysicists, and geologists. These materials are filled with colorful maps and enticing language pointing potential investors to selected high producing wells in the area, and estimate returns on investment totaling in the hundreds of thousands and millions for as little as a $54,500 investment. For example, the offering materials presented for the Gunsight Partnership include a "Total Return Potential For First Ten (10) Years" from 10% ownership (Berry's ownership percentage) of $697,000.00 to $4,530,000.00, based on "Expected – Cumulative Production/Well" from 100,000 to 650,000 BOE.

The Electra Program Proforma 10 promised 51% return on investment in the first year of the Electra Program and payout within 2.17 years. It also boasted $429,109 to $1,416,807 "TOTAL RETURN POTENTIAL" in two years with production of 11,070 to 44,280 BOE, based on initial daily production rates of 5-20 BOE/day. Actual estimates of initial daily production rates for Electra wells were listed as ranging from 34 to 87 barrels per day, 4-5 times the daily production rates used to tell investors that they could be millionaires in two years.

The Riverbend Prospect touted 605-1104% return on investment for a 10% ownership of the wells, with revenues from $113,241 to $6,465,930 for production of 11,780-47,120 BOE per well.

While Defendants have provided updates on current statuses of wells and production (albeit false), presumably to placate discontent investors, their reports conveniently do not lend any statistics that can be matched and measured against the projections they used to sell each project.

**Investors in Grace Resources wells have not received a check for production on any of the wells production and sales in a very long time, however production records from the Railroad Commission show definitively that production from the wells has been disposed and sold.** Defendants have given Berry and various other investors differing excuses as to why they have not been paid including, low gas prices, inclement weather slowing production, and Defendant, Billy Marcum Jr., absconding with oil. Berry fears that he will never receive another check from these wells from Defendants. In fact, Defendants have gone so far as to seek $1.5 Million Dollars of additional funding for projects that have failed to pay dividends.

Throughout Defendants' relationship with Berry, they've solicited investment in project after project, and submitted periodic reviews that boasted progress. Some of these progress updates and statements include:

- January 19, 2014: "Objective I of the Gunsight Partnership is progressing better than expected." [DOC: Annual Planning Meeting Jan19 Communication]

- January 27, 2014: "From this point on we should see a direct reflection of work done in the field and an increase in production." [DOC: Zimbra – RAB p. 12]

- February 20, 2014: "During the winter, the oil and gas industry typically sees a decline in oil production due to inclement weather conditions and other issues associated with the season. But, this has not been the case for the Gunsight Partnership. Because of the work we've been doing on several wells, we've not only remained steady with our oil production, we've seen a slight increase." [DOC: Gunsight_Update_Feb_20_2014]

- April 18, 2014: (regarding a new investment opportunity) "I am only sending this out to my current clients and feel that the raise and results of our past two programs did not merit sending a formal book." [DOC: Zimbra – RAB p. 13]

- June 14, 2014: "Grace will continue proving our passionate beliefs by increasing our performance to our partners." [DOC: Zimbra – RAB pg. 14]

- June 15, 2014: "We are doing everything to minimize risk and maximize returns for our partners." [DOC: Zimbra – RAB pg. 13]

- October 26, 2014: "…we are already doing the reworks on Electra and having amazing results. I am offering this to my clients first. We are offsetting wells that

13

have done initial production numbers from 40-65 BOPD and sustained that for 4-6 months. Our closest offset started at 39 BOPD and is still producing 35-36 BOPD. Wells like this will pay themselves in 4-6 months." [DOC: Zimbra – RAB p. 22]

- November 2, 2014: "Each program that we acquire, geologically evaluate, operate and structure is with you in mind. We set out not only to be different, but to bring you the strength derived from our company's ability to acquire strong prospects that are evaluated and operated by the best in the industry. … We are not only inviting our partners to share in the increased production from our 37 well workover program … Grace strongly believes that we should not hold out the best low-risk properties, but that we should share the success of those properties with our partners … this will give Grace and their partners a position of trust and strength. I have professionals that have joined with me and share this belief, **and are working for much reduced salaries** to help build a company that we can all believe in. … Again, thank you for your business and your trust." Emphasis added. [DOC: Zimbra - RAB p. 19-20]

- February 24, 2015: "I like to put my money in with yours becase I know the success we've had and I put my trust in my team. I stand behind what I bring to my partners 100%." [DOC: Zimbra – RAB p. 24]

- March 2, 2015: "Our intention is to bring you programs with as little risk and as much upside as possible … we are in a time of rapid growth but we are going to continue to make a concerted effort to do the little things right. We know that we need to reaffirm your trust in us every day …" [Zimbra – RAB p. 26]

However, these flowery declarations of projects "progressing better than expected," "increase in production," and "rapid growth" are belied by the K-1 tax forms prepared by Defendants (or their accountants), which betray immense, unexplained losses.

Defendants' Rock Energy Resources LLC and Gambill Energy LLC purport to be operators of the wells within the various projects. However, title records show these entities acquiring ownership of the leases well after the programs were to be in place and producing. Further investigation reveals that their predecessors in title were companies owned by Billy Marcum, Jr., who was touted as the operator of the projects. What's more is that Mr. Norvell has claimed that it was pursuing a lawsuit against Defendant Marcum for stealing production from the wellsite. Yet, deed records show Norvell and Defendant, Rock Energy Resources, LLC, just purchased an assignment from Marcum's company Blue Creek Energy LLC on January 31, 2017.

## VI. CAUSES OF ACTION

All of the foregoing paragraphs are incorporated by reference into each cause of action, and all facts and causes of action are pled in the alternative, as well as a whole, and apply to all Defendants unless specifically limited hereafter.

## COUNT 1 – COMMON-LAW FRAUD

Defendants made material false representations to Berry with the knowledge of their falsity or with reckless disregard of the truth with the intention that such representations be acted upon by Berry and that Berry relied on these representations to his detriment. As a proximate result of such fraud, Berry sustained the damages described more fully herein.

## COUNT 2 – FRAUD IN A REAL ESTATE TRANSACTION

Berry will show that Defendants' fraudulent representations as referenced above were made in connection with real estate transactions as defined by Section 27.01 of the Texas Business & Commerce Code, as the transactions involved purchases and sales of interests in oil and gas wells, and that said representations or omissions were made by Defendants for the purposes of inducing Berry to enter into a contract. As a proximate result of such fraud, Berry sustained the damages described more fully herein.

## COUNT 3 – NEGLIGENT MISREPRESENTATION

Berry will show that Defendants made representations in the course of Defendants' business, that said representations constitute misstatements of fact made without use of reasonable care in obtaining or communicating the information, and that Berry justifiably relied on Defendants' representations to his detriment. As a proximate result of said negligent misrepresentations, Berry sustained the damages described more fully herein.

## COUNT 4 – BREACH OF CONTRACT

Berry entered into Subscription and Partnership Agreements with Defendants for every program in which he subscribed. Defendants made certain promises for Berry's money, including, per Section 8 of the Partnership Agreements, opening "all books to inspection by any partner or authorized representative at any time during ordinary business hours" and providing annual reports with "a detailed statement of the transactions by the Partnership with the Managing General Partner [Grace Resources] … showing the amount paid or accrued to each recipient and the services performed." Partnership Agreement – Gunsight Partners, L.P. Defendants have yet to provide any statements of transactions in the almost three years Berry and Defendants have been in business together.

And despite multiple requests to examine the books, Defendants have refused to comply with their promise to allow access. They state that such access is impossible due to litigation, filed in July 2015, with their former CFO, who presumably locked down and encrypted all financial documents. This justification for their breach of contract fails for multiple reasons:

1. Defendants hired an outside accounting agency in early 2015 to perform year end accounting and generate K-1 tax forms. Other parties have access to and presumably still have possession of the records Berry would like to examine.

2. The 2014 K-1 tax forms were produced to investors in July and September of 2015, after the CFO's resignation, which begs the question: if Defendants couldn't access any records, how were these financial documents completed?

3. Defendants have been operating programs and continuing work on wells for roughly a year and a half since their former CFO, Malter, resigned. Even if we believe that they don't have access to corporate documents and financials from before July 2015, they have given no reason why they shuoldn't be able to access transaction histories and financial documents created and collected *since July 2015*, when they would presumably be storing these elsewhere, somewhere accessible.

4. In response to Berry's second request to review company records, Defendants asserted that two women were getting the books in order. Yet, over six months later, at Berry's third request to review company documents, Defendants simply fell back on the Malter Lawsuit from July 2015.

16

As a result of Defendants' unsubstantiated breach, Berry has been unable to properly examine and protect the interests of the Robert A. Berry 2010 Trust and has further incurred the damages described herein.

## COUNT 5 – DECEPTIVE TRADE PRACTICES ACT

Berry is a "consumer" under the DTPA; Berry acquired a good or service by purchase from Defendants. Defendants are "persons" who can be sued under the DTPA. Berry will show that Defendants have engaged and are still engaging in misleading or deceptive acts or practices in connection with Berry's transactions. Specifically, Defendants' actions constitute the following violations enumerated in Section 17.46 of the Texas Business & Commerce Code:

(1)    Passing off goods or services as those of another;

(2)    Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3)    Causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

(5)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

(6)    Representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand;

(7)    Representing that goods or services are of a particular standard, quality, or grade, if they are not;

(8)    Disparaging the goods, services, or business of another by false or misleading representation of facts;

(9)    Advertising goods or services with intent not to sell them as advertised;

(12)    Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

(24)    Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

17

Berry relied on the foregoing false and misleading acts and practices to his detriment. Defendants' DTPA violations were committed knowingly and/or intentionally, which entitles Berry to recover treble economic damages under Section 17.50(b)(1) of the Texas Business & Commerce Code. Further, Defendants engaged in unconscionable conduct and actions which were glaringly noticeable, flagrant, complete, and unmitigated, which entitles Berry to recover damages for mental anguish under Section 17.50(a)(3) of the Texas Business and Commerce Code.

Defendants' wrongful conduct was a producing cause of Berry's damages described more fully herein.

## COUNT 6 – BREACH OF FIDUCIARY DUTY

Berry and Defendants had a fiduciary relationship. Defendants, as those with operating control over the relationship, owe Berry, who had no operational control, one of the highest fiduciary duties under the law. *Huffington*, 532 S.W.2d at 579. Indeed, when Defendants asked Berry for a $1.5 Million Dollar loan, Berry attempted to gain some operational control, and was rejected by Defendants. At that time, Berry made clear his reliance on Defendants' fiduciary obligations: "My only interest in getting involved is to protect my current investment, and given the issues to date, I would have no interest in simply putting in money to be managed by your team. I do expect you to work diligently to protect the investments that you have solicited from others – esp [sic] me!" The Defendants breached their duties to Berry. The Defendants breaches resulted in injury to the Berry and significant benefit to the Defendants.

## COUNT 7 - VIOLATIONS OF THE TEXAS SECURITIES ACT

Section 4.A of the Securities Act defines securities to include any "investment contract." The investment opportunities offered for sale and sold by Defendants for investor profit constitute investment contracts and, therefore, are securities as defined by the Securities Act. Under established Texas law, whether there is an investment contract is determined by reference to

four factors, to-wit: the investment of money, a common enterprise expectation of profits, whether the investor makes any significant efforts, and whether the efforts made by those other than the investor are undeniably significant ones—those essential managerial efforts which affect the failure or success of the enterprise. There is an expectation of profits. Defendants enticed potential investors with substantial rates of return.

After the investment of funds, investors have no duties other than to wait on their profits or returns. Investors have no way to remove Defendants from continually committing fraud, or any way to prevent Defendants from continually causing them harm. All four factors have been met in the instant case and the investment opportunities offered for sale and sold to people were investment contracts; thus, Defendants are selling securities.

## (A) SALE OF UNREGISTERED SECURITIES

These securities are not registered with the Commissioner as required by the Securities Act. Section 7.A(1) of the Securities Act prohibits the sale or offer for sale of unregistered securities as follows:

> No dealer or agent shall sell or offer for sale any securities issued after September 6, 1955, except those which shall have been registered by Notification under subsection B or by Coordination under subsection C of this Section 7 and except those which come within the classes enumerated in Section 5 or Section 6 of this Act, until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner...

The securities offered for sale and sold by Defendants have not been and are not currently registered with the Securities Commissioner, nor has a permit been granted for the sale of such securities as required by Section 7 of the Securities Act.

## (B) FAILURE TO REGISTER PERSONS SELLING

Section 12.A of the Securities Act requires that all persons selling or offering to sell securities in Texas must be registered under the Act as follows:

> Except as provided in Section 5 of this Act, no person, firm, corporation or dealer shall, directly or through agents, offer for sale, sell or make a sale of any securities in this state without first being registered as in this Act provided. No agent shall, in behalf of any dealer, sell, offer for sale, or make sale of any securities within the state unless registered as an agent for that particular registered dealer under the provisions of this Act.

During the period that securities were sold and offered for sale, Defendants were not registered as dealers or agents as required by Section 12.A of the Securities Act.

## (C) FRAUDULENT PRACTICES IN THE SALE OF SECURITIES

The use of fraud and fraudulent practices in connection with the offer for sale and sale of securities is prohibited by Sections 4.F, 25-1, and 32.A of the Securities Act. In Section 4.F of the Securities Act, fraud is defined as follows:

> The term "fraud" or "fraudulent practice" shall include any misrepresentations, in any manner, of a relevant fact; any promise or representation or prediction as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; . . . provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity.

Defendants, in the issuance, sale, promotion, negotiations, advertisement, or distribution of securities in the State of Texas, have engaged in fraud and fraudulent practices by misrepresenting material facts and intentional failing to disclose material facts as outlined above. Defendants, with intent to deceive or defraud or with reckless disregard for the truth or the law, have materially aided, and are materially aiding, one another in the fraudulent practices set forth above.

## COUNT 8 – CONVERSION

Berry, owned, possessed and had the right to immediate possession of the personal property comprising the programs, including the oil and gas production from the wells in these programs.

Defendants wrongfully exercised dominion or control over this property. As a proximate result of such fraud, Berry sustained the damages described more fully herein below.

## VII. NEED FOR INJUNCTIVE RELIEF

Immediate injunctive relief in the form of a temporary restraining order against Defendants is necessary to prevent the continuing unlawful acts and to mitigate the harm that is being done to investors. Such order should also require the immediate production or provision for examination of Defendants' books, company records, and financial documents, as is required under Defendants Partnership Agreements with Berry. Without injunctive relief, Defendants will continue to engage in fraud and fraudulent practices as set forth above. Defendants will continue to subvert investor interests and have opportunity to doctor company documents and financials before Berry has a chance to review and evaluate them. Defendants will continue to sell unregistered securities in violation of the laws of the State of Texas and divert the proceeds to their personal use, to the severe harm of the investors and the general public, unless enjoined from doing so. Immediate injunctive relief is also necessary to restrain Defendants from further wasting, secreting, and otherwise dissipating the investors' funds, derived funds, revenues, and other assets acquired and held in connection with the sale of the above-described securities to the public, and from destroying or hiding records from which restitution may be made, damages may be paid, and which are necessary for Berry to discover the extent of Defendants' illegal operation.

All of the above-stated harm to Berry, other present and future investors, and to the general public of the State of Texas resulting from Defendants' unlawful activities is substantial and immediate and will be irreparable without immediate injunctive relief. There is no adequate remedy at law.

The needed immediate injunctive relief should be granted by temporary restraining order. After notice and hearing, Berry asks that the injunctive relief be granted and extended by a

temporary injunction pending through trial or arbitration, and after final hearing, Berry asks that Defendants be permanently enjoined.

## VIII. NEED FOR AN AUDITOR

Defendants engaged in fraud and fraudulent acts in connection with the activities described above. Defendants have refused to distribute production checks altogether and refused to provide Berry of an accounting thereby, even though production has been had. In accordance with Texas Rule of Civil Procedure 172, an investigation and examination of Defendants accounts not only "appears necessary", but is necessary, "for the purpose of justice between the parties to this suit." Therefore a "court shall appoint an auditor or auditors to state the accounts between the parties and to make the report to the court as soon as possible." Tex. R. Civ. P. 172.

An "accounting" is "an action for equitable relief against a person in a fiduciary relationship to recover profits taken in a breach of that relationship." Blacks Law Dictionary at 20 (7th Ed. 1999). The purpose of an accounting is "avoiding unjust enrichment. In this sense it reaches monies owed by a fiduciary or other wrongdoer, including profits produced by property which in equity and good conscience belonged to the plaintiff." Law of Remedies Sec. 4.3(5) at 408 (2d Ed. 1993). The accounting of funds in this case will assist the parties and the Court in preventing the dissipation of proceeds upon which a constructive trust is placed. A partner may maintain an action against another partner for legal or equitable relief, including an accounting of partnership business, to enforce a right under the partnership agreement or a statutory right under the GPA. TEX. BUS. ORGS. CODE ANN. § 152.211(b) (West 2012). A partner's duty of loyalty includes "accounting to and holding for the partnership property, profit, or benefit derived by the partner" both in the conduct and winding up of the partnership business and from the partner's use of partnership property. TEX. BUS. ORGS. CODE ANN. § 152.205(1) (West 2012).

With enactment of the Business Organizations Code, the requirements for a member to

access records changed to: "A member ... on written request and for a proper purpose, may examine and copy" the required records. Tex. Bus. Orgs.Code § 101.502(a). The Code additionally provides that a "governing person" of a covered "entity may examine the entity's **books and records** ... for a purpose reasonably related to the governing person's service as a governing person." *Id.* § 3.152(a). The Code further authorizes an award of attorney's fees as an available remedy for denial of access, at least as to a request by a governing person. *Id.* § 3.152(c).

It is a necessity that the Court appoint an auditor under the facts pled herein.

## IX. NEED FOR A RECEIVER

A receiver is needed for the funds and assets of Defendants in order to conserve and protect said funds and assets for the benefit of the investors should damages be granted in this case, or in aid of any arbitration resulting therefrom. A court of competent jurisdiction may appoint a receiver in an action between partners or others jointly owning or interested in any property or fund, or in any other case in which a receiver may be appointed under the rules of equity. Tex. Civ. Prac. & Rem. Code 64.001(a)(3); 64.001(a)(6). Under Subsection (a)(3), the receiver may be appointed on the application of the plaintiff in the action or another party. Tex. Civ. Prac. & Rem. Code 64.001(b). The party must have a probable interest in or right to the property or fund, and the property or fund must be in danger of being lost, removed or materially injured. Tex. Civ. Prac. & Rem. Code 64.001(b).

In this case, there is no question that Berry, as an investor in Defendants schemes, has a joint ownership and interest in those wells and the production amounts of oil, gas and other minerals obtained therefrom. There is also no question that the property and funds are in serious danger of being lost, removed or materially injured. With respect to the wells themselves,

23

Defendants sold the Riverbend Program property without Berry's consent and presumably Defendants kept all of the proceeds resulting therefrom. There is a substantial likelihood that Defendants may attempt to do this with the other wells. Furthermore, Defendants have refused to operate these wells prudently, and make prudent decisions for the future of the wells productivity, putting the property and funds in danger of being materially injured.

With respect to the production obtained from the wells, Berry has not received their proportionate interest in the sales of production in almost a year, despite their being production from the wells in that time frame. Thus, the ongoing sales of production from these wells are in serious jeopardy and danger of being lost in Defendants pockets, removed from the books, and being materially injured.

This Court should also appoint a receiver under 11.403 and 11.405 of the Business organizations Code, given that "the application of [Berry] whose right to or interest in any property or fund or the proceeds from the property or fund is probable, a court that has jurisdiction over specific property of a domestic or foreign entity may appoint a receiver in an action: (3) between partners or others jointly owning or interested in the property or fund; because Berry has "shown that the property or fund is in danger of being lost, removed, or materially injured;(2) circumstances exist that are considered by the court to necessitate the appointment of a receiver to conserve the property or fund and avoid damage to interested parties; (3) all other requirements of law are complied with; and (4) the court determines that other available legal and equitable remedies are inadequate."

Unless receivership relief is granted and a temporary receiver is appointed for the affairs of Defendants, the funds and other property held by the Defendants will be dissipated and lost to the immediate and irreparable harm of the persons who invested or purchased securities from Defendants. There is no adequate remedy at law.

For the aforementioned reasons, an order should be issued appointing a temporary receiver for all money, property, and assets of any kind held in the name of Defendants; all records pertaining to the sale of securities by Defendants; and all money, property, and assets of Defendants containing or derived from proceeds of Defendants' sale of investments and securities or used in furtherance thereof.

## X. DAMAGES

Defendants' conduct proximately caused significant damages to Berry, for which he seeks recovery, both past and future damages, as follows:

a) Out of pocket damages;

b) Actual damages;

c) Benefit of the bargain damages;

d) Damages for mental anguish under Section 17.50(a)(3) of the Texas Business & Commerce Code;

e) Treble damages under Section 17.50(b)(1) of the Texas Business & Commerce Code;

f) Exemplary damages;

g) Attorney's fees, expert witness fees, costs for copies of depositions, and costs of court under Section 27.01 of the Texas Business & Commerce Code;

h) Pre-judgment and post-judgment interest; and

i) Such other and further relief to which the Plaintiff may be entitled at law or in equity.

## XI. RULE 47 STATEMENT

As required by Texas Rule of Civil Procedure 47, damages sought by Berry are in excess of the minimum jurisdictional limits of this Court; Berry seeks monetary relief of over $1,000,000.00 and demand for judgment of all other relief to which Berry is entitled.

## XII. CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays:

1.     That the Court grant a temporary restraining order, rendered before notice and hearing, until determination of the Plaintiff's Application for Temporary Injunction or other order of the Court, enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert of participation with them who receive actual notice of the order by personal service or otherwise;

2.     That an order be rendered, before notice and hearing, appointing a temporary receiver to take charge of the property and assets held and claimed by Defendants which contains, or is derived from, proceeds of their sale of securities or used in furtherance thereof, and to conduct the business affairs of Defendants with the powers;

3.     That the Court order Defendants to notify the banks and institutions of the entry of the temporary restraining order and order appointing a temporary receiver, in that such accounts are held in the name of Defendants and/or proceeds from the unlawful and fraudulent scheme described herein have been deposited in such banks and institutions;

4.     All property and assets enumerated in paragraph 3 above be placed in *custodia legis* as of the date of the appointment of the temporary receiver herein;

5.     The Court issue subpoenas ordering Defendants to appear for deposition, to testify and give evidence concerning the acts or conduct or things complained of in this cause;

6.     The Court grant a temporary injunction after notice and hearing, enjoining the Defendants from engaging in the acts listed in paragraph 1 of this Prayer;

7.     The Court, after notice and hearing, extend the appointment of the temporary receiver;

8.     All persons be enjoined and restrained by the temporary injunction from interfering with these proceedings, and from commencing or prosecuting any action or appeal or obtaining any preference, judgment, attachment, garnishment, or other lien, or making any levy against the receiver, or against any receivership assets or any part thereof, and from asserting any claims against

26

them, except in these proceedings;

9.      The Court impose a constructive trust and equitable lien on any assets belonging to Defendants insofar as these assets are derived from defrauded investors;

10.      The Court appoint an auditor to account for the Defendants books and records and make application and report thereof to the Court.

11.      Upon final hearing hereof, the temporary injunction be made a permanent injunction;

12.      Upon final hearing hereof, the order directing the receiver to take possession of the affairs of the Defendants be made permanent;

13.      The Court order that an auditor be appointed; and

14.      The Court award Plaintiff his reasonable and necessary attorney fees for preparing and prosecuting this cause; and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants, jointly and severally, for economic damages and actual damages in an amount within the jurisdictional limits of this Court, treble damages, exemplary damages, damages for mental anguish, together with attorney's fees, expert witness fees, costs for copies of depositions, and costs of court; pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully Submitted,

**Faulk Barchus PLLC**


___/s/ Brandon Barchus_____
**Brandon M. Barchus**
State Bar No. 24052873
**Ashley Hymel**
State Bar No. 24079974
7503 Shadyvilla Lane
Houston, Texas 77055
Tel. 713.239.4000
Fax. 832.201.8208
**Attorneys for Plaintiffs**
bbarchus @ faulkbarchus.com

## VERIFICATION

STATE OF TEXAS §
§
COUNTY OF HARRIS §

Before me, the undersigned authority, personally appeared Brandon M. Barchus, who after being duly sworn, upon his oath stated the following:

I am over the age of 18, and competent to testify. I have read the foregoing document along with exhibits attached and every factual averment therein is correct and true within my personal knowledge.

BRANDON BARCHUS

Sworn to and subscribed before me this 3rd day of March, 2017 to which I place my signature and official seal.

Notary Public in and for the State of Texas

PENNY ARRECIS
Notary Public, State of Texas
Comm. Expires 10-09-2017
Notary ID 129588383

29