# Exhibit D

# PARTNERHIP AGREEMENT

# GUNSIGHT PARTNERS, L.P.

THIS AGREEMENT is between GRACE RESOURCES, LLC, a Texas limited liability corporation (the "Managing General Partner"), and those other persons (the "General Partners") who are admitted as General Partners pursuant to the terms of this Agreement and those other persons (the Limited Partners") who are admitted as Limited Partners pursuant to the terms of this Agreement.

In consideration of their mutual promises below, the parties agree as follows:

## 1. THE LIMITED PARTNERSHIP

1.1. Formation of Limited Partnership. The Managing General Partner, the General Partners and the Limited Partners form a limited partnership (the "Partnership") pursuant to Texas Business Organizations Code, Title 4, Chapter 153, as amended from time to time (the "Law").

1.2. Filings. The Managing General Partner has filed a certificate of formation of a limited partnership and shall execute further documents and take further action as the Managing General Partner may consider necessary or advisable to comply with the requirements of law for the formation and operation of a limited partnership in all counties, states, foreign countries and other jurisdictions where the Partnership may elect to do business. Neither the Managing General Partner nor the Partnership shall have any obligation to deliver or mail a copy of the certificate (or any amendments thereto) to the General or Limited Partners.

1.3. Name. The name of the Partnership shall be: GUNSIGHT PARTNERS, LP, with such changes or variations as the Managing General Partner may consider necessary or advisable to comply with the requirements of law or regulatory bodies in any jurisdiction in which the Partnership may do business.

1.4. Principal Place of Business. The location of the principal place of business of the Partnership shall be 801 E. Campbell Road, Suite 245C, Richardson, Texas 75081, or at any other place as may be selected from time to time by the General Partner.

1.5. Business. The Partnership shall engage in the business of acquiring, owning, developing, exploring, holding, operating, producing, marketing and disposing of oil and gas properties and oil, gas and related products. Without limiting the generality of the above, the Partnership shall, in the Managing General Partner's sole discretion:

(a). Acquire (by lease, purchase, exchange, farmout or otherwise), accept, hold, own, explore, develop, operate, lease, sell, exchange, farm out, abandon and otherwise dispose of interests of all kinds (direct or indirect) in oil and gas properties (proved or unproved, developed or undeveloped) and in equipment, supplies, machinery, facilities, systems, plants, pipelines and other assets.

(b). Drill for, produce, process, refine, transport, market, sell, exchange and otherwise dispose of oil, gas and related products.

(c). Become a general or limited partner or joint venturer with others.

(d). Take part in other kinds of transactions presenting different or greater business risks the economic effect of which may reasonably be expected to be substantially the same as ownership and production of oil, gas and related products.

(e). Undertake any operations or activities, including but not limited to the drilling of development, exploratory, replacement, supplementary recovery, acceleration or other similar wells, to produce and market oil, gas and related products efficiently, and contract with and make payments to others for or in connection with the drilling of these wells.

(f). Subject to the requirements of subparagraph 16.1(c), sell, exchange or otherwise dispose of all or substantially all of its assets and, pursuant to subparagraphs 1.7 and 16.1(e), transfer all or substantially all of its assets to a consolidated partnership comprised of all partnerships in a Fund.

(g). Borrow money, either secured or unsecured, and hypothecate, encumber and grant security interests in the Partnership's assets, including but not limited to the Partnership's interests in oil and gas production and the proceeds of production.

(h). Acquire and hold Partnership property in the name of the Partnership or of any nominee (including the Managing General Partner or an affiliate of the Managing General Partner) and enter into agreements with any nominee, indemnifying the nominee except for willful misconduct.

(i). Purchase liability and other insurance to protect the Partnership's properties and business;

(j). Purchase or sell production payments or grant calls or options to purchase or otherwise acquire the Partnership's production of oil, gas and related products for any reason.

(k). Purchase, with Partnership income and the proceeds of Partnership borrowings, General and Limited Partners' interests tendered to the General Partner pursuant to Article 12 if (i) this purchase does not impair the capital or operations of the Partnership.

{l}. Dispose of and sell any properties or rights obtained on behalf of the Partnership;

(m). Engage in any transaction or activity incidental to or supportive of one or more of the above.

1.6. Partners. Grace Resources, LLC, shall be the managing general partner of the Partnership. The General Partners of the Partnership shall be those persons who are admitted as general partners pursuant to this Agreement, including those whose subscription payments for the Partnership, and those who are subsequently admitted to the Partnership by the Managing General Partner pursuant to Article 11. The Limited Partners of the Partnership shall be those persons who are admitted as limited partners pursuant to this Agreement, including those whose subscription payments for the Partnership, and those who are subsequently admitted to the Partnership by the Managing General Partner pursuant to Article 11. The Managing General Partner may hold Limited Partner interests in the Partnership as well as its General Partner interest and, with respect to its Limited Partner interests, shall be subject to and shall benefit from the provisions of this Agreement relating to Limited Partners in the same manner as other Limited Partners.

1.7. Transfers to Consolidated Partnership. The Managing General Partner shall have the power, in its discretion, pursuant to subparagraph 3.2(g), to transfer all or substantially all of the assets of the Partnership to a consolidated partnership comprised of all partnerships formed under a Fund if it believes that this transaction is in the best interests of the Partnership and all other partnerships. This consolidated partnership shall continue the businesses of the Partnership and all other partnerships. Pursuant to subparagraph 16.1(e), no vote of the Limited Partners shall be required, and the Partnership shall be dissolved as provided in Article 16. The interests of the Managing General Partner and each of the General and Limited Partners in the revenues, receipts and other income, costs, expenses and other expenditures of the consolidated partnership shall be based on a sharing ratio, which shall be the ratio of the amount of such partners' interest in Available Partnership Capital to the total amount of Available Partnership Capital in all partnerships.

1.8. Three Objectives of the Partnership. The first objective of the Gunsight project will be to acquire 100% working interest in 1,784 net leasehold acres from Blue Creek Operating and other minority owners. The

acreage is located in Wichita and Clay County, Texas and is subdivided into nine leases. The acquisition will include more than 90 active wellbores, of which 15-18 (estimated two per lease) will be recompleted with the intent to increase oil production. The operator will also recomplete three water disposal wells. To increase the production from these wells, engineers recommend the following recompletion process: replace flow-lines and selective water storage tanks; replace down-hole pumps, parted rods and tubing leaks; repair electrical equipment and pumping unit motors. If adequate funds are available the General Partner has discretion to engage in activities that will benefit the Partnership, including, but not limited to, the purchase oil rigs or other equipment.

The second objective will be to recomplete 50 additional wells on the existing leasehold acreage. These wells will also require rods, tubing and down-hole pumps to possibly increase the production on the leases and establish additional cash flow to the partners. In addition, there will be 10 new wells drilled to test deeper zones from 2,500 feet as well as current proven zones that are not currently producing but have in the past. Current offset production around the Gunsight zones, L.P. has been proven from deeper zones at 1,650 feet. Also, there is proven offset production from The KMA and Canyon zones within the Temple lease at a depth of 3,200 and 5,100 feet. The Patrick lease is in an area where new production has been established, offsetting the lease area at 2,100 feet with an initial production of 75 barrels of oil per day. The development of these deeper zones should add additional long-term sustained production to the current leases and enhance the overall production of the partnership. There are current zones above the wells current producing horizons that can also be completed to enhance the wells current production and the overall Estimated Ultimate Recovery (EUR) of each well in the partnership.

The third objective will be the installation of the water-flood process to the shallow zones (230-640 feet) on the existing wells. This secondary recovery process has never been established on the current lease acreage. A report completed in 2004 by Ted Cooper P.E., noted that a water-flood of the shallower zones could yield an additional 500,000 barrels of oil for the Hill, Birk, and KEBMC leases. Water-flooding is the process of injecting water into the reservoir to increase pressure and thereby stimulate production. The operator will establish new injection wells on a five spot system to perform the water-flooding process to the shallow zones. The zones will be completed together and commingled under the Railroad Commission of Texas rules. In addition, the reworks will also receive the benefit of the water-flood process as a re-pressurization of the field.

1.9. Mandatory exercise in participation in Objective II and Objective III. The Managing General Partner fully intends to complete Objective I of the Gunsight project before proceeding to raise capital for Objective II. After completion of Objective I each partner in the Gunsight project will be granted a first right of refusal to buy in to a second partnership (Objective II) and again for the third partnership (Objective III) upon completion of Objective II. The Managing General Partner in its sole discretion can change the scope and specific requirements of Obctive II and Objective III upon notification to the General and Limited Partners.

In the event a general or limited partner elects not to exercise its right of first refusal in either Objective II or Objective III ("Non-Electing Partner") the Partnership has the right to purchase the interest of the Non-Electing Partner for the amount of the Non Elected Partner's capital contribution less twenty five percent (25%) or the fair market value of the Non-Electing Partner's interest, whichever is less. The Partnership has six (6) months to make such payment to the Non-Electing Partner after the Non-Electing Partner's decision to not invest in either Objective II or Objective III.

1.10. Dissolution on Termination of the Production Payments. The Managing General Partner shall have the power, in its discretion, pursuant to subparagraph 3.2(h), to cause the dissolution of the Partnership upon termination of the production payments. The Partnership shall then be dissolved as provided in Article 16.

## 2. DEFINITIONS

2.1. Affiliate of the Managing General Partner shall mean (a) any person directly or indirectly owning, controlling or holding with power to vote 10% or more of the outstanding voting securities of the Managing General Partner; (b) any person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the Managing General Partner; (c) any person directly or indirectly controlling, controlled by or under common control with the Managing General Partner; (d) any officer, director or partner of the Managing General Partner; and (e) if that other person is an officer, director or partner of the Managing General Partner, any other company for which such person acts in any such capacity.

2.2. Available Partnership Capital shall mean funds remaining for the conduct of the Partnership's business, which will be equal to Total Capital Contributions less funds applied to payment of the Managing General Partner's management fee and sales and distribution expenses.

2.3. Cost as used with respect to property transactions shall mean (a) the price paid in an arms' length transaction by the Managing General Partner, any of its affiliates or the Partnership for the property, including lease bonuses and drilling, completion and associated equipment costs; (b) title insurance and title examination costs; brokers' commissions and finders' fees; filing fees and recording costs; taxes, including income taxes, if any, but not including ad valorem taxes; and engineering, land, legal, geological, geophysical, nominee, seismic, drafting, accounting and audit costs and other similar charges incurred in connection with the property transaction; and (c) that portion of the Managing General Partner's, any of its affiliates' or the Partnership's reasonable, necessary and actual expenses that are incurred not more than 36 months prior to the acquisition of the property, and that are allocated to the property in accordance with allocation procedures conforming to accepted industry practice that are employed by the Managing General Partner, its affiliates or the Partnership from time to time, for geological, geophysical, nominee, seismic, land, engineering, drafting, drilling of commercially productive wells, accounting, auditing, legal or other such services obtained or provided by the Managing General Partner, any of its affiliates or the Partnership; interest, loan commitment and other financing fees for funds used to acquire or maintain the property; property rentals; and ad valorem taxes.

2.4. Cost as used with respect to services shall mean the actual reasonable and necessary costs and expenses incurred by the Managing General Partner, any of its affiliates or the Partnership on behalf of the Partnership or the partners in providing these services, determined in accordance with presently existing generally accepted accounting principles.

2.5. Development Well shall mean a well of the Partnership drilled within the proved area of an oil and gas reservoir to the depth of a stratigraphic horizon known to be productive.

2.6. Exploratory Well shall mean a well of the Partnership drilled to find and produce oil and gas in an unproved area, to find a new reservoir in a field previously found to be productive of oil or gas in another reservoir, or to extend a known reservoir. Generally, an exploratory well is any well that is not a development well, a service well or a stratigraphic test well.

2.7. Farmout shall mean a transaction in which the owner of a lease or working interest agrees to assign an interest in certain specified acreage to the assignee, retaining some interest, such as an overriding royalty interest, an oil and gas payment, offset acreage or other type of interest, subject to the drilling of one or more specified wells or other performance as a condition of the assignment.

2.8. General and Administrative Expenses shall mean the costs of employee compensation and benefits, executive management, bookkeeping, accounting, reporting and other similar services for the partners and the Partnership, data processing, office rent, depreciation, taxes and interest on investment or expenditures that are necessary, reasonable and appropriate for the conduct of the Partnership's business, indirect legal services, mailing, clerical and other office employees, travel and telephone charges, and other items of a general and administrative nature, whether like or unlike the above, that are customarily incurred by oil and gas operators for their own accounts.

2.9. Operating Costs shall mean expenditures made and costs incurred in producing, hauling, gathering, treating, storing, transporting and marketing oil and gas from completed wells, including, in addition to labor, fuel, repairs, materials, supplies, utility charges and other incidental costs ad valorem, excise and severance taxes, insurance and casualty loss expense and compensation or reimbursements to well operators, the Managing General Partner or any of its affiliates for any services rendered in conjunction with the management or operation of the oil and gas properties.

2.10. Overriding Royalty Interest shall mean an interest in the oil and gas produced pursuant to a specified oil and gas lease or leases, or the proceeds from their sale, carved out of the working interest, to be received free and clear of all costs of development, operation and maintenance.

2.11. Proved Reserves shall mean the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided only by contractual arrangements, but not on escalations based upon future conditions.

Reservoirs are considered proved if economic producibility is supported by either actual production or conclusive formation test. The area of a reservoir considered proved includes (a) that portion delineated by drilling and defined by gas-oil and/or oil-water contacts, if any, and (b) the immediately adjoining portions not yet drilled, but which can be reasonably judged as economically productive on the basis of available geological and engineering data. In the absence of information on fluid contacts, the lowest known structural occurrence of hydrocarbons controls the lower proved limit of the reservoir.

Reserves that can be produced economically through application of improved recovery techniques (such as fluid injection) are included in the "proved" classification when successful testing by a pilot project, or the operation of an installed program in the reservoir or one with similar rock and fluid properties, provides support for the engineering analysis on which the project or program was based.

Estimates of proved reserves do not include the following: (a) oil that may become available from known reservoirs but is classified separately as "indicated additional reserves"; (b) crude oil, natural gas and natural gas liquids, the recovery of which is subject to reasonable doubt because of uncertainty as to geology, reservoir characteristics or economic factors; (c) crude oil, natural gas and natural gas liquids that may occur in undrilled prospects; and (d) crude oil, natural gas and natural gas liquids that may be recovered from oil shales, coal, gilsonite and other sources.

2.12. Proved Developed Reserves shall mean the proved reserves that can be expected to be recovered through existing wells with existing equipment and operating methods. Additional oil and gas expected to be obtained through the application of fluid injection or other improved recovery techniques for supplementing the natural forces and mechanisms of primary recovery are included as proved developed reserves only after testing by pilot project or after the operation of an installed program has confirmed through production response that increased recovery will be achieved.

2.13. Proved Undeveloped Reserves shall mean proved reserves that can be expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage shall be limited to those drilling units offsetting productive units that are reasonably certain of production when drilled. Proved reserves for other undrilled units can be claimed only where it can be demonstrated with certainty that there is continuity of production from the existing productive formation. Estimates of proved undeveloped reserves will not be attributed to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless these techniques have been proved effective by actual tests in the area in the same reservoir or one with similar rock and fluid properties.

2.14. Sales and Distribution Expenses shall mean the costs and expenses of selling and distributing interests in the Partnership.

2.15. Total Capital Contributions shall mean total contributions to Partnership capital by all partners including the Managing General Partner.

2.16. Working Interest shall mean an interest in an oil and gas lease which is subject to some portion of the expense of development, operation or maintenance.

2.17. Payout is the point in time when the cumulative amount of Net Cash distributed to the partners equals 100% of the amount of capital contributions to the Partnership by the limited partners.

## 3. LIABILITY, MANAGEMENT AND CONVERSION

3.1. Limited Partners. The liability of the Limited Partners shall be limited as provided by the Law. The Limited Partners shall take no part whatever in the control, management, direction or operation of the affairs of the Partnership and shall have no power to bind the Partnership.

3.2. The General Partners. The General Partners, including the Managing General Partner, shall be subject to the liabilities of a partner in a partnership without limited partners. The interests of General Partners, with the exception of the Managing General Partner, shall be automatically converted to limited partnership interests upon the after the all wells contemplated in this Agreement have been drilled and completed.

3.3 The Managing General Partner. The Managing General Partner shall, to the best of its ability, control, manage, direct and operate the Partnership and shall have full and exclusive power and authority to do all things necessary or advisable for that purpose. Without limiting the generality of the above, the Managing General Partner shall have full and exclusive power and authority on behalf of the Partnership:

(a). To do or cause to be done any action that the Managing General Partner may consider necessary or advisable to carry out and accomplish any of the transactions or activities specified in paragraph 1.5, for the consideration, upon those terms and conditions and from, to or with these persons (including but not limited to the Managing General Partner and any affiliate of the Managing General Partner) as this Agreement may specifically provide or, in the absence of a provision, as the Managing General Partner may consider necessary or advisable.

(b). To expend the Partnership's contributed capital, income and borrowings and to execute and deliver all checks, drafts, endorsements and other orders for the payment of Partnership funds.

(c). To invest any Partnership funds, pending their use for other Partnership purposes, in demand or time deposits, short-term governmental securities, commercial paper and other similar investments.

(d). To enter into, execute, deliver and perform (i) all deeds, assignments, leases, subleases, farmout agreements, joint venture agreements, equipment leases, pooling and unitization agreements, division orders, operating agreements, transfer orders, processing agreements, gas sales agreements, transportation agreements, gasoline plant agreements, recycling agreements, drilling agreements, dry hole and bottom hole agreements, acreage contribution agreements, participation agreements and other agreements, instruments and documents that may be employed in the oil and gas industry in connection with the acquisition, ownership, operation or sale or other disposition of oil and gas properties and oil, gas and related products, and other instruments affecting the disposition of hydrocarbons or minerals in any manner whether or not extending beyond the term of the Partnership; (ii) all promissory notes, mortgages, deeds of trust, security agreements and other similar agreements, instruments and documents; and (iii) all other agreements, instruments and documents of any kind or character relating to the affairs of the Partnership, whether like or unlike the above.

(e). To purchase or sell production payments or grant calls or options on the Partnership's production for any purpose, including but not limited to the purpose of acquiring, drilling, developing, equipping or improving the properties of the Partnership or accelerating revenues or distributions of the Partnership.

(f). To sell additional limited partner interests in the Partnership for the consideration and on the terms and conditions as the Managing General Partner may determine without the vote of the General and Limited Partners.

(g). To transfer all or substantially all of the assets of the Partnership to a consolidated partnership comprised of all partnerships formed in a fund pursuant to the terms of paragraph 1.7 and subparagraph 16.1(e).

(h). To effect the termination and liquidation of the Partnership, without a vote of the General and Limited Partners, pursuant to the terms of paragraph 1.8.

3.4. Indemnification of the Managing General Partner. The Partnership shall indemnify and hold the Managing General Partner harmless from and against any and all loss, damage, cost or expense (including attorneys' fees) actually and reasonably incurred by the Managing General Partner in connection with the negotiation, settlement or defense of any contemplated, threatened or pending action, suit or proceeding by or in the right of the Partnership, or by a third party, to which the Managing General Partner was or is threatened to be made a party because of its capacity as Managing General Partner or by reason of the fact that it was or is the managing general partner, if the Managing General Partner acted in or with respect to the matter complained of in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Partnership. With respect, however, to any claim, issue or matter as to which the Managing General Partner shall be finally adjudged to be liable for negligence, misconduct or breach of fiduciary obligation in the performance of its duty to the Partnership, the Managing General Partner shall be indemnified and held harmless only to the extent that the court in which the action, suit or proceeding was brought shall determine, upon application, that the Managing General Partner is fairly and reasonably entitled, in view of all the circumstances of the case, to be indemnified and held harmless.

The Partnership shall make no payment to the Managing General Partner unless (a) ordered to do so by a court or (b) authorized to do so in the specific case, which authorization shall be supported by written opinion of independent legal counsel to the effect that the Managing General Partner met the applicable standard of conduct required for it to be indemnified and held harmless. The rights of the Managing General Partner shall be cumulative of, and in addition to, any other rights, remedies and recourses to which the Managing General Partner shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

3.5. Tax Matters Partner. The Managing General Partner is designated as the Partnership's "tax matters partner" described in section 6231(a)(7) of the Internal Revenue Code of 1954, as amended (the "Code") and shall possess all necessary power and authority to act in that capacity under the Code on behalf of the Partnership and the General and Limited Partners. All costs incurred by the Managing General Partner in its capacity as tax matters partner, including without limitation the fees of legal and accounting advisors, shall be considered costs and expenses of the Partnership under Article 7.

3.6. Other Activities by the Managing General Partner and its Affiliates. The Managing General Partner and each of its affiliates (other than officers of the Managing General Partner or any of its affiliates) shall be free at all times to engage generally in all aspects of the oil and gas business for their own account including but not limited to the organization, formation and operation of other partnerships, joint ventures and other oil and gas investment programs similar to the Partnership.

## 4. GUARANTEED PAYMENTS

The Partnership shall pay to the Managing General Partner on formation of the Partnership a fee equal to 5% of the Total Capital Contributions as a Management Fee. The payments to the Managing General Partner shall be for its services in (a) organizing the Partnership, (b) screening, investigating and reviewing possible farmouts, (c) completing the farmout transactions and (d) managing, conducting, administering and reporting the Partnership's business and financial affairs.

## 5. TRANSACTIONS WITH THE MANAGING GENERAL PARTNER AND ITS AFFILIATES

5.1. Reimbursement for Offering and Operational Expenses. The Partnership shall reimburse the Managing General Partner and its affiliates for the Partnership's allocated share of the sales and distribution expenses incurred by the Managing General Partner and its affiliates in connection with the offering of interests in the partnership or partnerships formed in a fund. The reimbursement to the Managing General Partner for expenses shall not, however, exceed an amount equal to 10% of Total Capital Contributions. The expenses shall be allocated among the partnerships formed in a _____ fund on the basis of the relative amounts of their Total Capital Contributions.

**5.2. Reimbursement for General and Administrative Expenses.** The Partnership shall reimburse the Managing General Partner and its affiliates for the Partnership's allocated share of the general and administrative expenses incurred in connection with the conduct of the Partnership's operations or the business affairs of the General and Limited Partners. The share of general and administrative expenses charged to the Partnership shall be determined by the Managing General Partner or the affiliate on the basis of an allocation of the total general and administrative expenses incurred by it. Partnership general and administrative expenses shall not be reimbursed or paid from Partnership capital. The reimbursements or payments shall be made only from Partnership revenues or funds other than contributions to Partnership capital by the Limited Partners and the General Partners.

**5.3. Other Transactions.** Other transactions between the Partnership and the Managing General Partner and its affiliates shall be subject to the following provisions:

(a). **Purchases, Sales and Farmouts of Property.** Except for the purchase of production payments from the Managing General Partner any purchase of producing property by the Partnership from the Managing General Partner or an affiliate of the Managing General Partner, or any sale of producing property by the Partnership to the Managing General Partner or an affiliate of the Managing General Partner, shall be made at cost as adjusted for intervening operations unless the Managing General Partner has reason to believe that the cost of the property (as so adjusted) is either materially in excess of or materially lower than its fair value, in which case the purchase or sale shall be made at the independently appraised value of the property purchased or sold. The Partnership will not sell undeveloped properties to any partnership or program in which the Managing General Partner or any affiliate has an interest, except that this restriction will not apply to joint ventures or transactions among partnerships in programs that the Managing General Partner or an affiliate may sponsor pursuant to which property is transferred in exchange for the transferee's obligation to conduct drilling activities on the property if (a) the respective obligations and revenue sharing of all parties to the transaction are substantially the same and (b) the compensation arrangement or other interest of the Managing General Partner or any affiliate is the same in each program or, if different, the aggregate compensation or interest of the Managing General Partner or affiliate does not exceed the lower of the compensation or interest the Managing General Partner or affiliate would have received in any one of the programs. Notwithstanding the above any sale of undeveloped leasehold interests, which shall not include farmouts of these interests, shall be made only at the greater of their cost or their fair market value.

(b). **Operating Agreements.** Payment by the Partnership to the Managing General Partner or any affiliate of the Managing General Partner for serving as operator of Partnership oil or gas properties shall not exceed the Managing General Partner's or the affiliate's costs and expenses incurred in providing these services to the Partnership, including but not limited to a charge for allocable general and administrative expenses.

(c). **Borrowing.** Any loan to the Partnership by the Managing General Partner or an affiliate of the Managing General Partner may bear interest at a rate which shall not exceed the lesser of the rate at which the Partnership could borrow from commercial banks without regard to the Managing General Partner's or its affiliates' financial abilities or guarantees or the amount it would cost the Managing General Partner or affiliate to obtain a similar loan from its customary commercial banking sources. Whenever the Partnership participates in the same transaction with the Managing General Partner or one or more affiliates of the Managing General Partner and financing is obtained for the benefit of all of the participants, the Partnership shall become liable to pay only its pro rata share of the loan, and its interest in the properties purchased shall be mortgaged only as security for the share of the loan for which it becomes liable. Notwithstanding the above no creditor of the Partnership shall have or acquire as a result of making any loan to the Partnership any direct or indirect interest in the profits, capital or property of the Partnership other than as a secured party.

(d). **Other Services.** The Partnership shall pay the Managing General Partner and any affiliate of the Managing General Partner for any geologic, geophysical, engineering, land, legal, operating, nominee and other technical services, studies, evaluations, bookkeeping, accounting, data processing, reporting and similar services relating to the conduct of the Partnership's operations and the business affairs of the Limited Partners that the Partnership obtains from the Managing General Partner or such affiliate. The price paid by the Partnership shall not exceed the Managing General Partner's or the affiliate's cost incurred in providing the service, study or evaluation (including an allocated share of the compensation of any persons employed by the Managing General Partner or the affiliate in connection with any activity), determined by the Managing

General Partner or the affiliate on the basis of an allocation of the total costs incurred by it for all services. All benefits from marketing arrangements or other relationships affecting property of the Managing General Partner or any affiliate and the Partnership shall be fairly and equitably apportioned according to the respective interests of each.

## 6. PARTNERSHIP CAPITAL

The contributed capital of the Partnership shall be established as follows:

6.1. Managing General Partner. On formation of the Partnership, the Managing General Partner shall contribute to Partnership capital cash in an amount equal to 1% of Total Capital Contributions.

6.2. General Partners. Each General Partner shall make a cash contribution to Partnership capital of an amount determined in accordance with the General Partner's Subscription Agreement.

6.3. Limited Partners. Each Limited Partner shall make a cash contribution to Partnership capital of an amount determined in accordance with the Limited Partner's Subscription Agreement.

6.4. Interest and Return of Capital. After formation of the Partnership, no partner shall be entitled (a) to interest on his or her capital contribution or (b) to return of his or her capital contribution .

## 7. COSTS AND EXPENSES

All costs and expenses of the Partnership shall be paid from Partnership funds, including but not limited to (a) the Managing General Partner's guaranteed payments provided for in Article 4; (b) the reimbursement payments to the Managing General Partner and its affiliates provided for in paragraph 5.1; (c) the reimbursement payments to the Managing General Partner and its affiliates for general and administrative expenses provided for in paragraph 5.2, which shall not be paid from Partnership capital; (d) all interest charges and other costs and expenses of Partnership borrowings; (e) the costs and expenses of acquiring, holding, exchanging and transferring real and personal property interests, including but not limited to (i) the purchase price of these interests, (ii) finders' and brokers' fees and expenses and (iii) the fees and expenses of landmen, attorneys, geologists and engineers (including an allocated share of the compensation of any landmen, attorneys, geologists and engineers employed by the Managing General Partner and its affiliates in connection with any such transaction); (f) legal, accounting and engineering fees and expenses; (g) the costs and expenses of drilling, coring, logging, testing, completing, recompleting, equipping, reworking, plugging and abandoning wells; (h) the costs and expenses of operating wells and of producing, processing, transporting and marketing products of every kind (including an allocated share of the compensation of any persons employed by the Managing General Partner and its affiliates in connection with this activity); (i) taxes (except net income and excise or windfall profit taxes payable by the partners, unless these taxes are payable by the Partnership on behalf of the partners), insurance premiums and repair costs; (j) the costs and expenses of processing facilities, pipelines, gas sales facilities, supplemental recovery projects and other procedures and facilities necessary to accumulate and to produce efficiently the reserves of oil, gas and other minerals acquired by the Partnership; (k) the costs and expenses of forming and operating one or more nominees; and (l) every other cost and expense incurred in the Partnership's business, whether like or unlike the above.

## 8. ACCOUNTING AND REPORTS

8.1. Books. Complete and accurate books of account shall be kept at the principal place of business of the Partnership, which shall be open to inspection by any partner or his or her authorized representative at any time during ordinary business hours. The Partnership's accounting period shall be as determined by the Managing General Partner.

8.2. Access to Certain Information. Each General and Limited Partner shall have the right, at the General and Limited Partner's expense, to obtain from the Managing General Partner, on request, in person or by mail, a list showing the names, addresses and interests of the other General and Limited Partners in the Partnership. General and Limited Partners shall not have access to the Partnership's geologic or other confidential or proprietary

information except to the extent that the Managing General Partner is satisfied that improper use will not be made of this information and adequate precautions have been taken against improper disclosure.

8.3. **Accounts.** Separate capital accounts shall be maintained for the General Partners and each Limited Partner. In general, a partner's capital account shall be increased by that partner's contributions to the capital of the Partnership and his or her share of Partnership profits and shall be reduced by his or her share of losses and the amount of the distributions to him or her. The capital account shall also be adjusted for any other items which may be determined by the independent accountants for the Partnership.

8.4. **Transfers During Year.** In order to avoid an interim closing of the Partnership's books, the share of net revenues, receipts and other income, losses, costs, expenses and other expenditures under Article 9 of a partner who transferred part or all of his or her interest in the Partnership during the year may be determined by taking the pro rata share of those amounts for the year. The proration shall be made by the Managing General Partner or under its supervision, and may be based on the portion of the year which has elapsed prior to the transfer or may be determined under any other reasonable method. The balance of the net revenues, receipts and other income, losses, costs, expenses and other expenditures attributable to the Partnership interest transferred shall be allocated to the transferee of the interest.

8.5. **Examinations and Reports.** The Partnership's books of account shall be closed promptly after the close of each Partnership accounting period and an annual examination of the Partnership's financial statements shall be performed at the expense of the Partnership by an independent public accountant selected by the Managing General Partner. Within 120 days after the close of the accounting period, the Managing General Partner shall make a written report to each partner which shall include, for that accounting period, all statements considered necessary or advisable by the Managing General Partner to advise all partners properly about their investments in the Partnership, funds held for reinvestment and related matters. The annual reports shall contain financial information prepared on an accrual basis of accounting in accordance with generally accepted accounting principles as may be required from time to time by the Securities and Exchange Commission. The annual reports shall include a detailed statement of the transactions by the Partnership with the Managing General Partner or its other affiliates for the preceding fiscal year, showing the amount paid or accrued to each recipient and the services performed. Unaudited reports of operations will be furnished to the General and Limited Partners at least quarterly during the development period (as defined in paragraph 12.2). On or before March 15 of each year, the Managing General Partner shall provide each General and Limited Partner with an information letter with respect to his or her distributive share of income and expenses for income tax reporting purposes.

# 9. PARTNERS' INTERESTS IN REVENUES, COSTS, ETC.

9.1. Participation in Revenues and Costs.

(a). Partnership revenues, receipts and other income, costs, expenses and other expenditures shall be credited or charged as follows:

100% to the General (with the exception of the Managing General Partner) and Limited Partners prior to Payout

85% to the General (with the exception of the Managing General Partner) and Limited Partners subsequent to Payout

7.5% to the Managing General Partner subsequent to Payout

7.5% to the Operator subsequent to Payout

(b). The aggregate deductions to be claimed by the General Partners and the Limited Partners as their distributive shares of Partnership losses for the first two years of the Partnership shall not exceed the amount of equity capital invested in the Partnership.

9.2. **Allocations Among General and Limited Partners.** All allocations to the General and Limited Partners pursuant to this Article 9 shall be divided among them pro rata in the proportion that the contribution to Partnership capital by each General and Limited Partner bears to total contributions to Partnership capital by all of the General and Limited Partners.

9.3. **Partnership Non-Cash Items; Gains and Losses.**

(a). All percentage depletion and cost depletion shall be allocated among the partners in accordance with the provisions of section 613A(c)(7)(D) of the Code. For this purpose a partner's capital interest in a property shall be equal to the portion of the expenditures constituting the adjusted basis of the property that have been charged to the partners under paragraphs 9.1 and 9.2.

(b). All depreciation with respect to tangible personal property shall be allocated to the partners in the manner in which the expenditures for the tangible personal property were charged under paragraphs 9.1 and 9.2.

(c). All amortization with respect to organization expenditures shall be allocated to the partners in the manner in which the expenditures were charged under paragraphs 9.1 and 9.2.

(d). All investment tax credits shall be allocated to the partners in accordance with their respective contributions to the adjusted basis of the property giving rise to the credit under paragraphs 9.1 and 9.2.

(e). The adjusted basis of interests in oil and gas properties and other tangible personal property for purposes of allocating gain or loss from the sale, exchange or abandonment of the property shall be allocated among the partners in the manner in which the expenditures constituting the adjusted basis were charged under paragraphs 9.1 and 9.2.

9.4. **Managing General Partner's Interest.** The interest of the Managing General Partner in each material item of income, gain, loss, deduction or credit of the Partnership shall be equal to at least 1% of that item at all times during the existence of the Partnership.

9.5. **Adjustments.** In case the Partnership purchases the interest of a General or Limited Partner as provided in subparagraph 1.5(l), in case any partner's interest is surrendered as provided in Article 12 or in case any additional General or Limited Partners are admitted to the Partnership, the percentage participation in revenues and costs described in paragraph 9.1 for the Managing General Partner and the General and Limited Partners shall be proportionately adjusted so that the sum shall remain 100%.

9.6. **Section 704 Allocation.** Pursuant to section 704 of the Code, and for purposes of any applicable federal, state or local income tax law, the partners agree that the Partnership's income, gain, loss, deductions and credits shall be shared by them in accordance with the provisions of paragraphs 9.1 through 9.5.

## 10. DISTRIBUTIONS

10.1. **Distributions.** (a) Within 60 days after each full calendar quarter after formation of the Partnership (the "regular quarterly distribution dates"), or at such other times as shall be determined by the Managing General Partner, the Partnership shall distribute to the partners those cash funds as are not, in the opinion of the Managing General Partner, necessary to the conduct of the Partnership's business. Any distributions to a partner shall reduce their capital account and distributions shall be made to the partners, to the extent practicable, in proportion to their respective interests in Partnership revenues, receipts and other income under paragraphs 9.1 and 9.2.

10.2. **Monthly Payments.** In the Managing General Partner's discretion, the General and Limited Partners shall be permitted to elect to receive any distribution in monthly payments.

## 11. TRANSFERS

11.1. Mortgage of Limited Partner's Interest. Any General and Limited Partner may, with the written consent of the Managing General Partner, subject to fulfillment of the conditions set forth in subparagraph 11.5(a), assign all or any part of his or her interest in the Partnership by way of mortgage, pledge or other transfer for security purposes, and upon any foreclosure of any security interest and proper notice to the Managing General Partner, the Partnership shall then make directly to the assignee distributions which accrue under the provisions of this Agreement to the encumbered Partnership interest. The assignee, subject to fulfillment of the conditions set forth in subparagraph 11.5(b), shall be entitled to become a General or Limited Partner in accordance with authority set forth in the certificate of limited partnership for the Partnership.

11.2. Transfer on Death or Disability. Upon the death or legal disability of any General or Limited Partner, his or her interest in the Partnership shall pass to his or her legal representatives with full power in them or the heirs or legatees to become a General or Limited Partner, subject to fulfillment of the conditions set forth in subparagraph 11.5(b).

11.3. Assignment of Limited Partner Interest. A General or Limited Partner may transfer or assign all or part of his or her interest in the Partnership to any other person only upon the express approval of the Managing General Partner.

11.4. Effect of Agreement. Any assignee, transferee or donee (by conveyance, operation of law or otherwise) of all or part of a General or Limited Partner's interest in the Partnership, whether or not the assignee, transferee or donee becomes a General or Limited Partner as provided in subparagraph 11.5(b) below, shall be subject to and bound by the terms and conditions of this Agreement pertaining to the interest assigned, transferred or donated.

11.5. Conditions of Assignment of General and Limited Partner Interests.

(a). The interest of any General or Limited Partner in the Partnership shall be assignable in whole or in part, subject to all of the following:

(i). The assignment shall be made under circumstances as, in the opinion of counsel to the Partnership, would not result in the Partnership being considered to have been terminated for purposes of section 708 of the Code.

(ii). The assignment may be made only if, in the opinion of counsel acceptable to the Partnership, such assignment may be effected without registration under the Securities Act and would not result in the violation of any applicable state securities laws.

(iii). The assignment may be made only to an entity or person who satisfies all of the conditions set forth in subparagraph 11.5(d).

(iv). The Partnership shall not be required to recognize any assignment until the instrument conveying the interest has been delivered to the Managing General Partner for recordation on the books of the Partnership and accepted by the Managing General Partner.

(v). Unless an assignee becomes a General or Limited Partner in accordance with the provisions set forth below, the assignee shall not be entitled to any of the rights granted to a General or Limited Partner, other than the right to receive all or part of the share of the revenues, costs, cash distributions or returns of capital to which his or her assignor would otherwise be entitled.

(b). An assignee of the interest of a General or Limited Partner, or any portion if permitted, shall be admitted as a Limited Partner entitled to all the rights of a General or Limited Partner only if and to the extent that:
(i) the assignor gives the assignee the right in accordance with the authority described in the certificate of general or limited partnership for the Partnership;
(ii) the Managing General Partner consents in writing to the admission;
(iii) the Partnership shall have been paid for all costs and expenses incurred in connection with admission, including specifically, without limitation, costs incurred in amending the Partnership's certificate of general or limited partnership and all other filings referred to in paragraph 1.2; and

(iv) the assignee, transferee or donee executes and delivers all instruments, in form and substance satisfactory to the Managing General Partner, as the Managing General Partner may deem necessary or desirable to effect admission and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement.

(c). The Partnership and the Managing General Partner shall be entitled to treat the record owner of any General or Limited Partner interest as the absolute owner in all respects, and shall incur no liability for distributions of cash or other property made in good faith to the record owner until that time as a written assignment of the interest has been received and accepted by the Managing General Partner in accordance with this Agreement and recorded on the books of the Partnership. The Managing General Partner may defer the admission of any assignee, transferee or donee as a General or Limited Partner in order to limit the number of times each year when amended general or limited partnership certificates are required to be filed to four filings each year.

(d). In no event shall any General or Limited Partner interest, or any portion be sold, transferred or assigned to a minor, an incompetent, any person or entity not qualified to hold federal oil and gas leases, any person or entity that is unable to certify that he, she or it is entitled to "independent producer oil" and "independent producer" status or any other person not qualified to become a General or Limited Partner (other than the Managing General Partner or its designee in connection with the purchase of General or Limited Partner interests under Article 13). Any attempted sale, transfer or assignment shall be void and ineffectual and shall not bind the Partnership or the Managing General Partner.

11.6. Authority of Managing General Partner. Upon the terms set forth in this Article 11, the Managing General Partner is expressly authorized (a) to admit General and Limited Partners, (b) to file amended general and limited partnership certificates with respect to the above, and (c) to use the powers of attorney granted and in the Subscription Agreement to accomplish those filings and any concomitant amendments to this Agreement. In addition, the Managing General Partner is expressly authorized, in accordance with subparagraph 3.2(f), to admit additional limited partners to the Partnership without the consent of the General or Limited Partners for consideration and at that time as the Managing General Partner may select. Pursuant to paragraph 9.5, the Managing General Partner shall adjust the percentage set forth in paragraph 9.1 to reflect the capital contributions of the additional general and limited partners.

11.7. Purchase of Limited and General Partner's Interest. If at any time any representation, warranty, covenant or certification made by a General or Limited Partner to the Managing General Partner is untrue or breached, the Managing General Partner, or any party designated by the Managing General Partner, shall have the right to purchase the interest of that General or Limited Partner at a price calculated in accordance with paragraph 12.2 or 12.3 of this Agreement, as the case may be.

## 12. GENERAL AND LIMITED PARTNERS' RIGHT OF PRESENTMENT

12.1. Managing General Partner's Agreement to Purchase. Subject to the provisions of paragraph 12.9, the Managing General Partner shall purchase the Partnership interest of any General or Limited Partner who shall elect, by written notice to the Managing General Partner at the times described below (the "notice of presentment"), to sell the interest in accordance with the provisions of Article 12.

12.2. Purchase Price During Development Period. Until the time the Managing General Partner determines that sufficient production experience has been accumulated or sufficient reservoir data has been obtained to permit valuation of the development activities of the Partnership (the "development period"), the purchase price for the General or Limited Partner's interest will be an amount equal to 70% of the General or Limited Partner's interest in Available Partnership Capital, less an amount equal to 50% of any distributions credited to him or her by the Partnership in excess of 12.24% per year of his or her interest in Available Partnership Capital. During the development period, the Managing General Partner may adjust the purchase price to account for material changes in economic conditions affecting the Partnership, including increases or decreases in the market price of oil or gas, changes in income tax laws and regulations relating to oil and gas activities and similar matters.

12.3. Purchase Price After Development Period. After the development period, the purchase price for the tendered interest shall be an amount equal to the General or Limited Partner's percentage share (determined as

provided in paragraph 12.4) of the sum of the following amounts as of the last day of the calendar month next preceding the calendar month in which the notice of presentment is received by the Managing General Partner (the "valuation date"):

(a). All Partnership cash on hand, plus

(b). All Partnership prepaid expenses and accounts receivable less a reasonable reserve for doubtful accounts, plus

(c). An amount attributable to the Partnership's interests in proved reserves (including its interests pursuant to the production payments), determined as described in subparagraph 12.5 below, plus

(d). The net book value of all other Partnership assets, unless in the judgment of the Managing General Partner the net book value of a Partnership asset does not fairly represent its market value (less expenses of sale), in which case the market value (less expenses of sale) shall be determined by an independent appraisal. If the asset is an oil or gas interest determined by independent petroleum reservoir engineers or by the Managing General Partner not to contain proved reserves of oil or gas, then the Managing General Partner shall determine the market value of the asset. The market value (less expenses of sale) so determined shall be included instead of the net book value of the asset less an amount equal to all Partnership debts, obligations, accrued expenses and other liabilities.

12.4. **General and Limited Partner's Share.** The selling General or Limited Partner's interest in Available Partnership Capital referred to in paragraphs 1.7 and 12.2 and his or her percentage share of the amounts described in paragraph 12.3 shall be the selling General or Limited Partner's percentage interest in Partnership revenues, receipts and other income under paragraphs 9.1 and 9.2.

12.5. **Amount Attributable to Proved Reserves.** The amount attributable to the Partnership's interests in proved reserves shall be:

(a). For for proved reserves attributable to the Partnership's interests, 70%, of the discounted present value of the estimated future net revenues from the Partnership's production of proved developed producing reserves and, normally, of proved developed non-producing reserves, plus

(b). The lesser percentages of the discounted present value of the estimated future net revenues from the Partnership's production of other categories of proved reserves and, in some circumstances where the Managing General Partner, in good faith, determines that it is appropriate, from the Partnership's production of proved developed non-producing reserves, as the Managing General Partner shall reasonably determine in view of the nature and quality of the proved reserves.

The Managing General Partner shall employ independent petroleum reservoir engineers to estimate the future net revenues (before income taxes) from Partnership properties from which at least 80% of the latest fiscal year's revenues were derived, and the Managing General Partner shall estimate the future net revenues from the balance of the Partnership properties, which estimates shall be made annually commencing at the end of the development period. The Partnership shall pay an allocable share of the expenses of engineering. The Managing General Partner shall furnish the price and cost assumptions employed in estimating future net revenues, as well as other information necessary for these estimates. Cost shall include taxes. The estimated future net revenues for each year shall be discounted to present worth using an interest rate not in excess of the then posted prime interest rate of JP Morgan Chase, or its successor. The amount so determined from the last report of the independent engineers shall be adjusted by the Managing General Partner for estimated changes therein from the date of the report to the valuation date, (a) by reason of production, sales of or additions to proved reserves and lease and well equipment, sale or abandonment of leases and similar matters occurring prior to the valuation date, and (b) by reason of any of the following occurring prior to payment of the purchase price to the selling General or Limited Partner: distributions to or for the account of the selling General or Limited Partner, changes in well performance, increases or decreases in the market price of oil or gas, revision of regulation relating to oil imports, changes in income tax laws and similar matters. No adjustment by reason of production shall exceed the amount

at which the reserves produced were included in the purchase price being adjusted. Upon request, all of the adjustments shall be summarized by the Managing General Partner for the selling General or Limited Partner.

12.6. Notices, Payment of Purchase Price and Transfer of Interest. The Managing General Partner will purchase the General or Limited Partner interests only on July 1 of each year during the development period. The Managing General Partner will notify the General and Limited Partners on May 15 of each year during this period of the purchase price for interests at that time. A General or Limited Partner desiring to sell his or her interest to the Managing General Partner during this period must give written notice to the Managing General Partner by registered mail, return receipt requested, between May 15 and June 15. The date of receipt of notice by the Managing General Partner will establish whether notice has been properly delivered during the notice period. Payments will be made on July 1 of each year during the period or as soon as practicable. General and Limited Partners exercising their right of presentment during the development period will receive distributions based on their holding of interests through the quarter ended June 30 of the year in which their interests are purchased. Following the development period, the Managing General Partner shall pay the selling General or Limited Partner for his tendered interest not later than 120 days following the end of the calendar month in which the notice of presentment is received by the Managing General Partner. The Managing General Partner's obligation to make payment may be discharged by the Managing General Partner's determination that such payment would be a material detriment to the ongoing operations of the Partnership. Payment shall constitute a complete discharge of the entire participation of the General or Limited Partner in the business and assets of the Partnership. The interest of the selling General or Limited Partner shall be transferred to the party making payment. The selling General or Limited Partner shall execute and deliver to the Managing General Partner (or other party making payment for the interest) an assignment of interest and other documents and instruments as the Managing General Partner may reasonably request.

12.7. General and Limited Partner's Right to Rescind Tender. During the development period, a General or Limited Partner may rescind the sale of his or her interest pursuant to this Article 12 within 15 days following receipt of payment for the interest. Following the development period, a General or Limited Partner may rescind the tender of his or her interest in the Partnership pursuant to this Article 12 at any time within 15 days following the General or Limited Partner's receipt from the Managing General Partner of notice of the purchase price for the interest. In each instance, to effect a rescission the General or Limited Partner must give the Managing General Partner written notice by registered mail, return receipt requested, within the applicable time period.

12.8. Purchaser's Surrender Rights. The purchaser (including the Managing General Partner) of a Partnership interest sold pursuant to the provisions of this Article 12 shall have the right, with the consent of the Managing General Partner and at those times as the Managing General Partner shall approve, to surrender the interest purchased to the Partnership in exchange for the pro rata percentage share attributable to the interest of the net assets of the Partnership, including but not limited to a pro rata undivided interest in the Partnership's oil and gas property interests, which shall be assigned to the purchaser subject to a pro rata share of all liens and other encumbrances burdening the properties. The pro rata percentage share of Partnership net assets attributable to any Partnership interest shall be determined as provided in paragraph 12.4.

12.9. Limitations on Managing General Partner's Obligation. The Managing General Partner shall not be obligated to accept for purchase more than 10% of the General or Limited Partner interests in the Partnership during each notice period occurring in the development period or more than 1% of the General and Limited Partner interests in the Partnership during any one calendar month. If more interests than the Managing General Partner is obligated to purchase are presented during any notice period or month, those that the Managing General Partner will accept for purchase will be determined by lot. Any interest or part that the Managing General Partner does not accept for purchase by reason of the above limitation shall remain the property of the tendering General or Limited Partner for all purposes. It may become eligible for purchase by the Managing General Partner in a subsequent period but it shall not be considered to be presented for purchase until a new notice has been given to the Managing General Partner with respect to it. If the General or Limited Partner interests are listed for trading on a national securities exchange or are traded through the National Association of Securities Dealers Automated Quotation System or otherwise in the over-the-counter market, the right of presentment provided for in this Article 12, at the option and at the time determined by the Managing General Partner, may be terminated by the Managing General Partner by written notice to the General and Limited Partners.

## 13. AMENDMENTS

Amendments to this Agreement that (a) are of an inconsequential nature and do not affect the rights of the Limited Partners in any material respect or (b) are required or contemplated by this Agreement (for example, amendments required as the result of the admission of one or more additional Limited Partners pursuant to subparagraph 3.2(f)) or (c) are, in the opinion of counsel to the Managing General Partner, necessary to prevent the Managing General Partner or any of its affiliates from being in any manner subject to the provisions of the Investment Company Act as amended, may be made by the Managing General Partner through use of the powers of attorney granted herein. Any amendment made pursuant to part (c) of the preceding sentence shall be deemed effective as of the date of this Agreement. At its or their discretion, any amendment to this Agreement may be proposed to the partners by the Managing General Partner or by General and Limited Partners who contributed not less than 10% of the Partnership capital contributed by all General and Limited Partners. The Managing General Partner shall submit to the General and Limited Partners any proposed amendment together with an opinion of counsel as to the legality of the amendment and the recommendation of the Managing General Partner as to its adoption, within ten days after receipt of the proposal, unless a longer period of time shall be required to comply with federal or state laws or regulations relating to solicitation of proxies, conduct of a meeting or any other aspect of the processing of the proposal. A proposed amendment shall become effective at the time it has been approved in writing by General and Limited Partners who contributed more than 75% of the Partnership capital contributed by all General and Limited Partners. For purposes of obtaining approval, the Managing General Partner may require a response or cause a meeting to be held within a specified period of time, which shall not be less than 15 nor more than 60 days after the date on which the notice is mailed, at a reasonable time and place. Notwithstanding the above, no amendment which is not approved by all of the partners shall cause the Partnership to become a general partnership, alter the liability of the General Partners or the Limited Partners, change the term of the Partnership or alter the provisions of Articles 6 or 9 (subject to the Managing General Partner's right to admit additional General and Limited Partners and to determine the amount of the General and Limited Partners' capital contributions and the interests of the General and Limited Partners in Partnership revenues and costs, etc.). In addition, no amendment shall be adopted if the adoption would constitute a violation by the Limited Partners of the provisions of paragraph 3.1. The Managing General Partner shall give written notice to the Limited Partners promptly after any amendment has become effective.

## 14. REMOVAL OR REPLACEMENT OF MANAGING GENERAL PARTNER

If no event of dissolution described in paragraph 16.1 has occurred, the General and Limited Partners shall have the right, upon the affirmative vote of the General and Limited Partners who contributed more than 75% of the Partnership capital contributed by all of the General and Limited Partners, to remove and, if then permissible under the Law, to replace the Managing General Partner. If unanimous consent to replace the Managing General Partner is then required and is not obtained, then the Partnership shall be dissolved in accordance with Article 16. No action shall be taken which shall constitute a violation by the Limited Partner of the provisions of paragraph 3.1, or which shall adversely affect the economic interest of the General Partners in the Partnership. Moreover, no action shall be taken in a manner as to cause the Partnership to become a general partnership, alter the liability of the General Partners or the Limited Partners or adversely affect the federal income tax treatment of the Partnership. No proposal for any action shall be submitted to a vote of the General and Limited Partners until the time as the proposal has been endorsed in writing by the General and Limited Partners who contributed not less than 10% of the Partnership capital contributed by all of the General and Limited Partners. Any proposal so endorsed shall be submitted to the General and Limited Partners by the Managing General Partner together with an opinion of counsel as to the compliance of the proposal with the terms of this Agreement (including its permissibility under the Law) and the recommendation of the Managing General Partner as to its adoption. For a period of 90 days after receipt of notice of a meeting or vote for the purpose of determining whether it shall be removed or replaced, the Managing General Partner shall take no action with respect to its Partnership interest or any property interests received which renders the interests unavailable for sale to a properly authorized designee of the General or Limited Partners. The Managing General Partner shall sell the interests to the designee at a purchase price calculated in accordance with the provisions of paragraph 12.2 of this Agreement if written notice of designation and a request to purchase the interests are given to the Managing General Partner within the 90-day period. The closing of the sale shall occur within 30 days following notice to the Managing General Partner on the date specified in the notice. The purchase price shall be paid in full in cash at the closing or in any other manner as may be necessary in order not to endanger the solvency or liquidity of the Partnership.

15. TERM

The Partnership shall commence upon the filing of the certificate of formation of limited partnership referred to in paragraph 1.2. It shall continue for so long as the Partnership holds any interests in oil or gas property, unless dissolved sooner as set forth in paragraph 16.1.

16. DISSOLUTION AND TERMINATION

16.1. Dissolution. The Partnership shall not be dissolved by the death, incompetency, bankruptcy, insolvency or dissolution of a Limited Partner but it shall be dissolved upon the occurrence of any of the following events: (a) withdrawal (on 90 days' written notice to the Limited Partners, as provided below), dissolution or bankruptcy of the Managing General Partner, or any other event which would cause the Partnership to be dissolved under the Law; (b) the continued conduct of the Partnership business becoming unlawful; (c) the sale or other disposition of all or substantially all of the assets of the Partnership, which may be effected at any time after formation of the Partnership upon the affirmative vote of the Managing General Partner and of the General and Limited Partners who contributed more than 75% of the Partnership capital contributed by all of the General and Limited Partners; (d) the affirmative vote of the General and Limited Partners who contributed more than 75% of the Partnership capital contributed by all of the General and Limited Partners, with the vote being taken in writing upon the proposal by General and Limited Partners who contributed not less than 10% of the Partnership capital contributed by all of the General and Limited Partners; or (e) the transfer of all or substantially all of the assets of the Partnership to a consolidated partnership comprised of all partnerships formed in a Fund, which transfer may be effected without the vote of the General and Limited Partners notwithstanding part (c) of this paragraph. Any vote taken pursuant to part (c) and (d) of this paragraph which meets the requirements for action shall be binding upon the interests of all of the partners. The Managing General Partner shall give written notice to the General and Limited Partners of its intent to withdraw from the Partnership at least 90 days prior to the effective date of withdrawal. Prior to the effective date the Managing General Partner shall take no action with respect to its interest in the Partnership as Managing General Partner or any property interests received which renders the interests unavailable for sale to the properly authorized designee of the General and Limited Partners. The Managing General Partner shall sell the interests to the designee, as provided in Article 14 of this Agreement, if notice of the designation and a request to purchase the interests are given to the Managing General Partner prior to the effective date.

16.2. Accounting. Upon termination of the Partnership, a proper accounting shall be made of the capital of each partner and of the net profit or net loss of the Partnership from the date of the last previous accounting to the date of termination.

16.3. Liquidation. Upon the dissolution of the Partnership, by agreement of the partners or for any other reason, the Managing General Partner or, in the case of its dissolution or bankruptcy, a person elected by the General and Limited Partners, shall act as liquidator. The liquidator, whether the Managing General Partner or another person, may be paid a reasonable fee. The liquidator shall have full power and authority to sell, assign and encumber any or all of the Partnership assets. Notwithstanding this power, the liquidator shall be instructed not to sell or encumber any assets except (a) sales necessary in order to raise cash for the payment of creditors, and (b) assets not readily or conveniently divisible. All cash shall, to the extent necessary, be used to pay creditors, and any portion remaining shall be distributed to the partners or their properly authorized designees in accordance with their respective interests in Partnership revenues, receipts and other income under paragraph 9.1 and 9.2. Any Partnership assets other than cash, the distribution of which is not provided for by paragraphs 16.4 and 16.5, shall be distributed to the partners in the same manner as cash, subject to any amounts owing to creditors. All partners shall look solely to the assets of the Partnership for the return of their capital contributions and no partner shall have recourse against the personal assets of any other partner for this purpose.

16.4. Properties. All oil and gas properties not sold by the liquidator shall be conveyed and assigned to the partners or their properly authorized designees in undivided interests as tenants in common in accordance with

their respective interests in Partnership revenues, receipts and other income under paragraphs 9.1 and 9.2, subject to any amounts owing to creditors. All or any part of any oil and gas property may be sold by the liquidator to one or more affiliates of the Managing General Partner, or to the Managing General Partner itself.

16.5. Maps, Logs, etc. Notwithstanding the above, all maps, logs and other engineering, geological and geophysical data acquired by or developed for the use of the Partnership shall be transferred solely to the Managing General Partner upon dissolution. If any of the materials are sold by the Managing General Partner, the proceeds of sale shall be distributed to the General and Limited Partners. The General and Limited Partners shall be entitled, however, to copies of any materials at that time, upon payment of the costs of copying.

## 17. ARBITRATION

The parties submit all controversies, claims and matters of difference to arbitration in Dallas, Texas according to the rules and practices of The American Arbitration Association. This submission and agreement to arbitrate shall be specifically enforceable. Without limiting the generality of the above, the following shall be considered controversies for this purpose: (a) all questions relating to the breach of any obligation, warranty or condition, (b) failure of any party to deny or reject a claim or demand of any other party and (c) all questions as to whether the right to arbitrate any question exists. Arbitration may proceed in the absence of any party if notice of the proceedings has been given to the party. The parties agree to abide by all awards rendered in these proceedings. Awards shall be final and binding on all parties to the extent and in the manner provided by the Federal Rules of Civil Procedure. All awards may be filed with the Clerk of the Federal District Court in Dallas, Texas, as a basis of judgment and of the issuance of execution for its collection, and, at the election of the party making the filing, with the clerk of one or more other courts, state or federal, having jurisdiction over the party against whom an award is rendered or his or her property. This article shall not apply, however, to any cause of action which may arise under federal or state securities laws.

## 18. POWER OF ATTORNEY

Each General Limited Partner by the execution of this Agreement irrevocably constitutes and appoints the Managing General Partner, with full power of substitution, as the true and lawful attorney in his or her name, place and stead to execute, acknowledge, swear to and file (a) offers to lease for the sole and exclusive benefit of the General or Limited Partner and not in behalf of any other person in whole or in part, (b) assignments and requests for approval of assignments, (c) all statements of interests and holdings, (d) a statement of citizenship, (e) all other statements required or which may be required by the Mineral Leasing Act, as amended, and the regulations promulgated thereunder by the Department of Interior of the United States of America, (f) all statements required or which may be required in connection with obtaining leases or interests in leases in lands in any state, in Canada or in any other jurisdiction and (g) amendments to this Agreement that are, in the opinion of counsel to the Managing General Partner, necessary to prevent the Managing General Partner or any of its affiliates from being in any manner subject to the Investment Company Act as amended. This power of attorney shall be deemed coupled with an interest, shall be irrevocable and shall survive each General and Limited Partner's death or incapacity. Each of the General and Limited Partners agrees to be bound by any representations of the attorney-in-fact in such statements and waives any and all defenses which may be available to the General or Limited Partner to contest, negate or disaffirm the actions of the attorney-in-fact under this power of attorney.

## 19. NOTICES

All notices hereunder shall be sent by registered mail, return receipt requested, addressed as follows: if to the Managing General Partner, as set forth at the end of this Agreement and, if to a General or Limited Partner, as set forth in the Application and Distribution Election Form signed by the General and Limited Partner. Any party may from time to time give notice changing his or her address.

## 20. MEETINGS OF GENERAL AND LIMITED PARTNERS

Meetings of the General and Limited Partners may be called by the Managing General Partner or by General and Limited Partners who contributed not less than 10% of the Partnership capital contributed by all of the General

and Limited Partners for any matters for which General and Limited Partners may vote as set forth in this Agreement. The call for a meeting shall be deemed to have been made upon receipt by the Managing General Partner of a written request signed by the General and Limited Partners calling the meeting stating the purpose for which the meeting is called. Within 15 days after receipt of the request, or as soon as practicable, if a longer period is required to comply with federal or state laws or regulations relating to solicitation of proxies, conduct of the meeting or any other aspect of the proceedings, the Managing General Partner shall deposit in the United States mails written notice to all General and Limited Partners of the meeting and its purpose. The meeting shall be held on a date not less than 30 nor more than 60 days after the date on which the notice is mailed, at a reasonable time and place. A General or Limited Partner may vote at any meeting of General and Limited Partners either in person or by proxy executed in writing by the General or Limited Partner or by his or her duly authorized attorney-in-fact.

21. GENERAL PROVISIONS

(a). This Agreement includes and incorporates the terms and conditions of the Subscription Agreement pursuant to which the General and Limited Partners have invested in the Partnership, all of which are made a part of this Agreement as fully as set forth.

(b) Each General and Limited Partner agrees that prior to execution of this Limited Partnership Agreement that it has reviewed the Private Placement Memorandum and all documents relating to this Limited Partnership.

(c). This Agreement, together with the Subscription Agreement, contains the entire agreement among the parties.

(d). It shall be construed in accordance with, and governed by, the laws of Texas.

(e). It shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, successors and assigns, except as set forth above.

(f). It may be executed in any number of counterparts, all of which taken together shall constitute a single instrument.

IN WITNESS, the parties have executed this agreement as of ~~November,~~ _January 8, 2014_ ~~2013.~~

MANAGING GENERAL PARTNER: GRACE RESOURCES, LLC

_____

By :James Norvell, its Managing Member

GENERAL PARTNER

_Robert A Berry Trustee_

Name _Robert A Berry 2010 Trust_

_____

Co-Applicant

LIMITED PARTNER:

_____

Name

_____

Co-Applicant